WiixtakeR, Judge,
delivered the opinion of the court:
Plaintiff sues for damages for breach of his contract with the defendant for certain construction at the Eoosevelt Eoads project in Puerto Eico. This project called for the erection of 25 buildings at Daguao Army Base in Puerto Eico. Plaintiff alleges defendant breached .its contract with him in that it delayed .him in the construction of the buildings in three *78 ways: first, it failed to stake the site of the buildings in time; second, it changed the design of the buildings; and, third, it failed to furnish the required materials on time.
Plaintiff’s first two claims are untenable; the first, because, at the conclusion of the contract, he signed a release of the defendant from all claims under the contract except those reserved, and this claim was not reserved; the second, because the defendant reserved the right to make changes in design.
Plaintiff’s third claim is the only one on which he is entitled to recover. We think he is entitled to recover on this one because defendant had agreed to furnish the materials, and had represented that they would be available when needed; and that this representation induced plaintiff to reduce his price to the amount agreed upon; and that defendant failed in doing the things it represented it would do.
Plaintiff had included in his bid an item of $26,781.00 to cover additional costs which he expected would be incurred if defendant delayed in furnishing him materials, an obligation which the defendant assumed under the contract. Defendant’s agent asked plaintiff to eliminate this item from his bid, on the representation that the materials were available and that there would be no delay in furnishing them. Plaintiff agreed, and did reduce his bid by this amount.
The materials were not furnished when needed, as defendant had represented they would be, and, therefore, there has been a failure to satisfy the inducement offered plaintiff to enter into the contract, at the reduced figure.
For the failure to do so plaintiff is entitled to recover.
Defendant’s suggestion that defendant is excused because it used due diligence to fulfill its promise is not good, because it was an unequivocal promise, one given for a valuable consideration. This was not true in W. E. Barling v. United States, No. 49190 C. Cls., decided May 5, 1953. In that case there was no representation that the materials were available and would be furnished bn time, and a reduction in the contract price in consideration of this representation.
Defendant’s defense that it is excused from performance because in its sovereign capacity it had determined that it *79 was to the best interest of the Nation to perform other contracts in preference to this one is not sustained by the proof.
• ’ The question remains as to the amount of damage the plaintiff is entitled to recover. His original contract, plus changes, called for a total of $121,723.76. It cost plaintiff $140,665.33 to perform it. But, because of defendant’s delays in furnishing certain material, plaintiff was relieved from performing work of the agreed value of $7,522.45. So that it cost plaintiff $140,665.33 to do work which he had contracted to do for $114,201.31. Plaintiff is, therefore, out $26,464.02.
The major part of this loss, we think, was due to failure of defendant to furnish materials on time, but we cannot ignore the fact that plaintiff claims that a part of his damage was caused by the failure of the defendant to stake out the buildings on time — a claim which he did not except from his release — and by changes in the design of the buildings, which the defendant by the contract had reserved the right to make, and for the making of which it is not liable. It is, therefore, questionable whether plaintiff is entitled to recover the total difference.between his cost and his contract price as adjusted, even conceding that his costs were reasonably incurred, as we think we must concede under the proof.
We are of the opinion that plaintiff, in order to-prove his case; has claimed too much. As our findings show, his loss from both delay in the staking, of the buildings and the change in design was not great, but plaintiff says it amounted to something, and perhaps it did.
The total of the allowable items in plaintiff’s claim, which he excepted from the release, amounts to only $18,305.56. Plaintiff’s claim was for $30,090.53; however, this included an item which he denominates “profit expectancy” in the amount of $7,963.24. In a suit for breach of contract plaintiff is not entitled to profit on the amount of his damage. This item must be eliminated. Also, he claimed $6,704.88 for additional overhead expense, based on the time required to do the job in excess of 90 days. However, the contract time was 5 months, and, hence, he is only entitled to additional overhead for the time spent in excess thereof. This was 43 days. On the basis of his claim, his additional overhead for *80 43 days was $2,883.15. The allowable items in his claim thus amount to $18,305:56.
We are of opinion that if we give plaintiff a judgment, for this amount-of $18,305.56, he will be fairly compensated. Judgment for this amount will be entered against the defendant.
Howell, Judge; MaddeN, Judge; LittletoN, Judge; and Jones, Chief Judge, concur.
FINDINGS OF FACT ,
The court makes findings of fact, based upon the evidence, the report of Commissioner Currell Yance, and the briefs and argument of counsel, as follows:
1. Plaintiff is a citizen of the United States, and at all times material hereto was engaged in the business of building construction, with his office and residence in Ponce, Puerto Bico.
2. Oh or before September 17, 1943, plaintiff and eight other contractors were invited to bid on the construction of troop facilities consisting of 25 buildings, including a cold storage and ice plant at Site 31-168 Daguao Army Base, Puerto Bico.
Under the terms of the offering, plaintiff was to furnish all labor, construction, equipment and tools, and the defendant was to furnish and deliver at the site of the work, at no cost to plaintiff, all materials necessary for the completion of the work.
3. On September 17, 1943, plaintiff submitted a written offer to construct the said buildings within the shortest possible time under five months for the sum of $129,181. In making this price bid, plaintiff, in accordance with accepted construction practice, included an amount for contingencies, including delays in receiving materials needed to efficiently prosecute the work.
Upon receipt of plaintiff’s bid, the defendant’s negotiating officer,. Colonel P. Wilson Evans, Chief of the Operating Division, United States Engineer Office, Puerto Bico District, communicated with plaintiff and -urged' him to re *81 duce liis bid by eliminating the item representing contingencies for delays because all necessary materials were available. Plaintiff was assured by Colonel Evans that there would be no delays or disruptions due to lack of materials, as all necessary materials would be available when needed.
On the basis of these representations plaintiff agreed to eliminate from his bid the sum of $26,781, representing com tingencies for delays, and submitted a revised bid on September 25,1948, under which he offered to construct the said buildings within the shortest possible time under five months for the sum of $102,400.
On September 28, 1943, defendant’s negotiating officer, Colonel P. Wilson Evans, in a memorandum to the Control Services Section of the United States Engineer Office, advised:
Rafael Torres, Jr., has successfully performed several jobs for this District and a check of his supervisory personnel indicated that he should be able to handle the subject construction in a satisfactory and expeditious manner. The contract was therefore awarded to Rafael Torres, Jr., by negotiation * * *
4. On September 28, 1948, plaintiff entered into Contract No. W 1099-eng. 1466 with the United States, represented by Gus A. Draper, Major, Corps of Engineers, as contracting officer, to furnish all labor, construction, equipment and tools to complete the work (except as otherwise specified therein) of constructing troop facilities consisting of 25 buildings, including a cold storage and ice plant at Site 31-168 Daguao Army Base, Puerto Rico, in accordance with Specification No. 43-42 dated September 6, 1943, and Addenda Nos. 1 and 2 for the total contract price of $105,100. The contract required the defendant to furnish and deliver at the site of the work at no cost to plaintiff all materials necessary for the completion of the work. It was incumbent upon plaintiff to requisition all materials necessary for the completion of the work.
The contract and specifications, together with addenda, are in evidence as plaintiff’s Exhibit 3.
*82 5. The contract required plaintiff to commence work within five days after receipt of notice to proceed. Such notice was received on September 80,1943, and plaintiff arrived at the site and commenced work on October 5, 1943. The contract further required plaintiff to complete the entire work on or before February 29,1944, or within 147 calendar days after commencing the work.
6. The provisions of the contract and- specifications pertinent to the issues of this case are as follows:
Article 1. — Statement of Work. — * * * The work shall be commenced as indicated in Par. 1-06 of the Specifications, and shall be completed on or before 29 February 1944.
Aeticle 3. — Changes.—The contracting officer may at any time, by a written order, and without notice to the sureties, make changes in the drawings and/or specifications of this contract and within the general scope thereof. If such changes cause an increase or decrease in the amount due under this contract, or in the time required for its performance, an equitable adjustment shall be made and the contract shall be modified in writing accordingly. Any claim for adjustment under this article must be asserted within 10 days from the date the change is ordered: Provided, however, That the contracting officer, if he determines that the facts justify such action, may receive and consider, and with the approval of the head of the department or his duly authorized representative, adjust any sudi claim asserted at any time prior to the date of final settlement of thé contract. If the parties fail to agree upon the adjustment to be made the dispute shall be determined as provided in article 15 hereof. But nothing provided in this article shall excuse the contractor from proceeding with the prosecution of the work so changed.
1-03. Scope of Work. * * *
(e) Materials Furnished hy the Government. — The Contracting Officer, unless otherwise noted in these specifications, shall furnish and deliver at the site of the work at no cost to the Contractor all materials necessary for the completion of the work. Requisitions for the furnishing of materials shall be submitted by the Contractor and shall be subject to the approval of the Contracting Officer. All materials furnished by the Government that are not incorporated in the work shall be returned to the *83 Government in as good condition as when delivered to Mm, reasonable wear and tear excepted. _ ■
_ The responsibility of seeing that all materials necessary for the completion of the work in accordance with the Plans and Specifications, are requisitioned, shall be incumbent upon the Contractor.
(f) Where materials are specified hereinafter it is intended only as information to the Contractor. Where materials as specified and/or indicated on the drawings are not available, the Government reserves the right to furnish substitutes without additional increase in the contract price unless otherwise noted in these specifications.
1-04. Examination of Site; Drawings, Etc. — Each bidder shall visit the site of the proposed work and fully acquaint himself with conditions as they exist so that he. may fully understand the facilities, difficulties and restrictions attending the execution of the work under this contract. Bidders shall also thoroughly examine and be familiar with the drawings and specifications» The failure or omission of any bidder to receive or examine any form, instrument or document shall in nowise-relieve any bidder from any obligation with respect to-his bid.
1-08. Commencement, Prosecution and, Completion.
(a) The Contractor will be required to commence work within five (5) calendar days after receipt of notice to proceed to prosecute the said work with faithfulness and energy, and to complete the entire work within the time specified in the Contract. All parts of the work shall be prosecuted without interruption, as-vigorously as practicable during the entire period of the contract.
(b) There will be no liquidated damages required for failure on the part of the Contractor to complete the worlc within the time limit specified in (a) above.
(c) When conditions at the site of the proposed work are considered by the Contracting Officer to be unsatisfactory for prosecution of the work, the Contractor may be ordered in writing to suspend a part or all of the work until reasonable conditions for its prosecution, exist. When such suspension is not due, in the opinion of the Contracting Officer, to the fault or negligence of the Contractor, the time allowed for completion of such suspended work will be extended by a period of time-equal to that lost due to the delay occasioned by the-ordered suspension.
*84 1-21. Physical Pata. — From investigations,- including surveys made at the site, it is. assumed that physical conditions are approximately as indicated on the drawings, but the nature of the materials is not guaranteed. The Contractor is expected to visit the site and acquaint himself with conditions as they exist.
1-22. Lines, Grades, Stakes, and Templates..
(a) All necessary lines, grades, stakes, and templates will be furnished by the Contracting Officer. * * *
(b) The Contracting Officer will furnish, on. the request of the Contractor all location and - limit marks reasonably necessary for the conduct of the work, * * *
1-28. Claims, Protests, Appeal's, and 'Changeé. — If • the Contractor considers any work demanded ox him to be outside the requirements of the contract 'or if he considers any action or ruling of the Contracting Officer or of the inspector to be unfair, the Contractor shall without delay, upon such demand, action or ruling, submit his protest thereto in writing to the Contracting Officer, stating clearly and in detail the basis of his objections. The Contracting Officer shall thereupon promptly investigate the complaint and furnish the Contractor his decision, in writing, thereon. If the Contractor is not satisfied with the decision- of the Contracting Officer, he may within thirty- days, appeal in writing to the Secretary of War, whose decision or that of his duly authorized representative shall be final and binding upon the parties-to the contract. Except for such protests or objections as are made or recorded in the manner herein specified and within the time limit , stated, the records, rulings, instructions or decisions of the Contracting Officer shall be final and conclusive. All appeals from decisions of the Contracting Officer authorized under the contract shall -be addressed to the Secretary of War, Washington, D. C. The appeal shall contain all the facts or -circumstances upon -which the Contractor bases his claim for relief and should be presented to the Contracting Officer for transmittal within the time provided therefor in the contract.
1-29. Disp'utes. — Except as otherwise specifically provided in this contract, all disputes concerning questions of fact which may- arise under this contract, and which are not disposed of by mutual agreement, shall be decided by the' Contracting Officer, who shall reduce the decision to writing and mail- a copy thereof to the -Contractor at his address shown herein. Within 30 *85 days from-said mailing the Contractor'may appeal; in ■writing to the Secretary of War, whose written decision or that of his designated representative or representatives thereon shall be final and conclusive upon the parties hereto. The Secretary of War may, in his discretion, designate an individual, or individuals, other than .the Contracting Officer, or a board as his authorized. representative to determine appeals under this article.- * * *
1-31. Minor Modifications. — The right is. reserved to make such minor changes in the execution of the work to be done under these Specifications as in the opinion of the Contracting Officer may be necessary or expedient to carry out the intent of the. contract; provided, that the cost to the Contractor for doing the work shall not be increased thereby; and no increase in price over the contract rate will be paid to the Contractor on account of such changes.
7. During the performance of the contract, certain modifications were ordered pursuant to Article 3, resulting in a net increase in the contract price to a total of $121,723.76.
8.. Under date of March 13, 1944, plaintiff requested an extension of 45 days, or until April -14,1944,- within which to complete the work. The time for completion of the work under: the: contract and supplemental agreements was duly extended to April 14,1944.- Plaintiff completed the contract work as changed and supplemented within the time as- extended on April 12, 1944, and has been, paid the full price specified in the contract as adjusted by the supplementary agreements.
9. Upon receipt of plaintiff’s initial bid of September 17, 1943, defendant’s negotiating officer, Colonel P. Wilson Evans, requested a three months’ completion date, and during the period of negotiation- prior to executing the contract at all times insisted that the entire work be completed in 90 days, as the buildings were urgently needed by defendant in the prosecution of the war. Notwithstanding the requirement in the contract that the work be completed on or before -February 29,- 1944, Colonel Evans testified that he pressed for completion of the work by January 3, 1944, in order to carry out the orders he had received, that it was his understanding, and the understanding of the plaintiff, that-plain *86 tiff would schedule his organization and work in such a manner as, if possible, to complete the contract within '90 days, or on or before January 3, 1944. This understanding was confirmed by Colonel Evans in an interoffice memorandum ‘dated October 16, 1944, at which time it was stated:
2. At the time this contract was negotiated great pressure was being brought to speed up the completion of the Roosevelt Roads project. The contractor was told in very positive language that he was to complete his work at the earliest possible moment. An effort was made to have him specify a 3 months completion date but he would not agree to incorporating such completion date in the contract. However, he did say that, without respect to the date specified in the contract, he would attempt in every way possible to complete the work within 3 months and I believe that, except for the unavoidable delays on the part of the Government in supplying him materials, he would probably have substantially completed the job within the 3 months!
10. Prior to awarding the contract, defendant’s negotiating officer requested plaintiff to furnish information as to his organization and personnel. Plaintiff was then urged to increase the personnel of his organization in order to assure that the contract would be completed within 90 days. Plaintiff cooperated by enlarging his organization in order to complete the project within the promised 90 days. Plaintiff’s organization thus enlarged was checked by the United States Engineer Office and, in their opinion, it wag, adequate substantially to complete the work within 90 days.
11. In preparing his bid, and in the performance of the contract within the shortest possible time, plaintiff contemplated the use of assembly line methods. The assembly line method of construction of multiple building projects is a generally recognized method of procedure and it is generally recognized that such procedure results in reduction of labor costs on the project. Plaintiff planned to organize two crews, each of which would be under an engineer and each man of which would become a specialist in the particular job which he performed in such crew. Plaintiff testified that each crew consisted of excavators, concrete workers, steel workers, masons, and carpenters, and that he employed ex- *87 périenced foremen to direct the work of each crew all according to the plan of operation.
Plaintiff’s plan of operation contemplated (1) the necessary sequence of classes of work in the construction of the individual buildings, and (2) the usual, customary and proper coordination of work on the buildings as a whole so that construction of a number of buildings would go forward concurrently, separate types of work being rotated among the buildings in such manner as to provide for continuous progress in each class of work and, at the same time, to assure the performance .of each class of work in a single building in proper sequence with other work in the building. Thus, work on a number of buildings would progress simultaneously while each class of work on each building would be done promptly and in proper sequence as respects the individual building. This plan of operation and the sequence of the work would permit an economic use of workmen and equipment and would result in minimum costs. Any disruption in the plan of operation due to failure to receive materials when needed would necessitate the transferring of one class of workers from one job to another and at the same time hold up the following class of workers, thereby increasing the cost of labor.
Plaintiff was prepared to proceed and did proceed with the work on October 5, 1943, the date set for commencement. As scheduled by the plaintiff 90 percent of the work called for by the original contract would probably have been completed within the promised 90-day period, and all work would have been completed within the original contract time. For the reasons hereinafter shown the plaintiff completed the contract on April 12,1944, 43 calendar days after February 29,1944, the original contract completion date.
ALLEGED DELAYS DUE TO FAILURE TO STAKE
12. A notice to proceed was issued on September 28, 1943, and the contractor arrived at the site on October 3, 1943, ready to commence operations. The contract required defendant to stake the buildings, and lay out the sites. The *88 stalling , and commencement of work took place on the dates indicated in the following table:

13. The plaintiff on S¿ptember 29, 1943, visited the site following the receipt of the notice to proceed and called the Government’s attention to the fact that all the buildings had not been staked out, and was assured that staking would be accomplished to permit rapid progress, once his woi'kmen arrived on the job.
On October 13, 1943, plaintiff wrote a letter to the Government complaining about the staking in which plaintiff said:
It shall be very much appreciated if the necessary steps are taken to stake all the buildings included in my contract within the next three days.
The order to proceed was signed on September 30, that is twelve days ago, and the staking of the fifth building has not been completed.
*89 The schedule of work for this contract has been planned on the basis of proceeding with the work on ail 22 buildings at one time, in order to have the job done within the limited period of 120 days, which I personally offered, instead of the completion date of February 28, specified in the contract.
Your cooperation in expediting the staking work shall prove beneficial to help in successfully developing the policy of this contractor of finishing the work within the shortest possible time.
These were the only complaints made during the progress of the job with respect to the staking, and the Government took the action indicated in the table appearing in Finding 12.
By October 21, 1948, twelve buildings comprising 75 percent of the total work had been staked out, which was more than enough to permit plaintiff to proceed without delay. By November 9, 1943, with 104 days of the contract period remaining, seventeen buildings (including all but small buildings) and comprising approximately 90 percent of the work, had been staked. The last two buildings were staked prior to December 14,1943, 78 days prior to the expiration of the contract period. The small buildings could be constructed in 30 days.
The buildings not staked as of November 15, 1943, comprised 5.6 percent of the job. One small building had not been staked due to the fact that reinforced steel was being stored on the site by defendant, and the other’buildings were located on a borrow pit area, and, as of November 15, 1943, borrow operations had not been completed.
14. There is no proof of a credible nature that plaintiff would have completed the project any earlier had all the buildings been staked at the outset of operations.
15. The plaintiff did not file any claim for damages by virtue of the alleged delays in staking, and in a release dated July 6,1943, released defendant from all claims except those recited in his claim of July 5, 1944. The claim of July 5, 1944, did not make any contention that plaintiff had been delayed or damaged by reason of defendant’s delay in staking the site.
*90 ALU3GED DELAYS DUE TO CHANGES IN DESIGN
16. During the course of operations the Government found it necessary to make certain changes in design, chiefly because of the lack of materials. A list of the changes, briefly described, with the extra amounts involved follows:
Additional excavation for foundations-$2,724.62
Substitution of concrete block for concrete in certain buildings_ 4,767.20
Placement of reinforced concrete in certain build-ings_ 2,844. 82
Changing batten windows to jalousies- 1,830.90
Placing fill under floor slab__ 3,627.25
Painting of roofing_- 502.60
Miscellaneous items_ 2,035.73
Total_ 17,833.12
. Also plaintiff was directed to omit certain work, as follows:
Extra fill supplied by Government_$1,450.00
Elimination of electrical and plumbing work- 391.45
Elimination of refrigeration doors, bins, shelves, partitions, counters_ 872.20
Elimination of concrete foundations- 2,957.90
Elimination of bath and toilet_ 1,850.00
Total_ '7,522.45
Due to the changes in design, the net increase in the contract price was $10,310.67. These changes were reasonable and necessary.
The parties agreed upon the prices stated herein, and a change order was executed by both parties, increasing the contract price by the net difference.
Other changes brought the total increase in the contract price due to changes to $16,623.76.
17. The plaintiff at no time requested an extension of time by reason of said changes, or made a contention that said changes would extend the period of performance.
*91 By reason of said modifications the time needed to complete the project may have been somewhat lengthened, but the extent of such delay, if any, is not shown.
DELAYS — MATEBIALS
18. Under the terms of both the offering and the contract, defendant was required to furnish and deliver at the site of the work, at no cost to plaintiff, all materials necessary for the completion of the work. In bidding for the work, plaintiff was advised by defendant’s officers and believed that defendant would have on hand the materials which the defendant agreed to furnish to the successful bidder, and plaintiff prepared and submitted his hid accordingly. Plaintiff’s bid was lower by $26,781 than it would have been had he not been led to believe that the materials would be furnished as needed.
19. Under the terms of the contract, it was incumbent upon plaintiff to requisition all materials necessary for the completion of the work. Under date of October 6, 1943, plaintiff wrote the following letter to defendant:
Enclosed please find requisition covering estimate of construction materials needed for the prosecution of contract W. 1099 Eng. 1466.
It shall be appreciated that pursuant to the provisions of the above contract arrangements be made for the delivery of these materials at the site of work at no cost to the contractor.
Prompt delivery shall be appreciated to enable this contractor to finish the work within the shortest period of time, consistent with the information of the good supply of materials on hand and the necessity of the government of finishing the work at the earliest possible date.
Attached to the letter was a detailed list of all materials needed to construct the buildings.
The requisition of October 6, 1943, was a general requisition of all necessary materials for completion of the work and was intended both as a notice to defendant of the quantity of materials that would be needed in order that defendant could earmark and deliver the materials promptly when *92 requested by plaintiff, and as a compliance with, the contract. At the time the requisition of October 6, 1948, was delivered to defendant, defendant’s officers decided that the best policy would be to request plaintiff to submit a field requisition for material as and when required. Accordingly, as and when plaintiff needed materials he submitted supplementary requisitions for the specific material. The evidence discloses that plaintiff did submit timely requisitions for materials, but that defendant either failed to supply the same when needed or was completely unable to supply the material.
Defendant’s chief supply officer, Edward Bavouth, during the period involved, testified that defendant, during the work on plaintiff’s project, always lacked materials of one kind or another and many times four to nine weeks would elapse before materials were delivered to the project.
Defendant’s chief supply officer prepared a factual report for the years 1943 and 1944 which fully confirmed the constant lack of materials on plaintiff’s project. In said report the following statement was made:
Since the commencement of the Roosevelt Roads Project lack'of materials on various and repeated occasions has been a serious cause in holding up construction at the project. Lumber during various periods was very scarce in different sizes and length. Reference is made to various letters and telephone conversations between this office and the San Juan office and between the Officer in Charge and San Juan advising that lack of lumber was holding up construction.
Lack of electrical materials in the project was responsible for many buildings and projects being delayed before same could be completed in time. Plumbing fittings and fixtures for lavatories, urinals, and water closet fixtures have and still are retarding the completion of many buildings.
Over 40% of all lavatories and urinals received at the project arrived without proper and adequate fittings for same. Lack of an adequate amount of acetylene and oxygen during the whole period of construction delayed the prompt repair of equipment and vehicles, and on various occasions, held up construction of various buildings and projects such as the Cold-Storage Plant, The Finger Pier and others.
*93 20. On October 5, 1943, plaintiff started bis work by excavating two buildings. The next step following excavation was the placing of reinforced concrete foundations, but plaintiff was unable to proceed with this step because defendant was unable to supply form lumber and a delay of approximately 15 days took place until a substitute design was approved. During the entire construction period numerous similar delays occurred as a result of defendant’s failure to supply materials. The evidence shows that defendant’s inability to deliver materials on plaintiff’s field requisitions was almost a daily occurrence. Plaintiff’s work program suffered continuous disruption because of delays in obtaining form lumber, lumber for trusses, general hardware (including hinges, bolts, latches, masonry bolts for foundations, and expansion bolts), cement, lime, sand, electric materials, and fittings (including wire, conduits, switches, panels, brackets, and reflectors), plumbing materials (ineluding pipe, fittings, and fixtures), quarry tile, masonite sheets, roof asphalt, refrigeration asphalt, cork, and many other materials.
21. In some cases when a material was requisitioned because needed at a particular time to advance the work, the defendant, instead of delivering all the material that was needed, made only partial deliveries over a protracted period of time. For example, plaintiff requisitioned certain material on November 13, 1943. A part of this material was first delivered to plaintiff on December 2, 1943. Some was delivered on December 10,1943, some on March 1, 1944, and the balance on March 3, 1944. In another instance, plaintiff requisitioned certain material on November 16,1943. It was furnished to him in five partial deliveries: November 23, November 24, November 29, December 22, 1943, and January 29, 1944. In another instance, plaintiff requisitioned certain material on December 10, 1943. It was actually delivered in four shipments — the first on December 14, 1943, and the last on February 3,1944.
Although some of the materials were delivered when needed, the great bulk of the material was not delivered when needed or within a reasonable period of time after the same was needed. Under plaintiff’s work schedule, partial *94 delivery of needed materials left him in little better position than if the delivery had not been made. At other times, when plaintiff presented a requisition containing four or more items, the items on hand would be delivered and the remaining items crossed out. This necessitated the filing of duplicate requisitions at such times as the plaintiff learned that the needed materials had arrived in defendant’s warehouses. This practice was a frequent occurrence.
22. From the very beginning of the work the defendant failed to deliver the materials required for the orderly progress of the work. For example, the plumbers and electricians were delayed because they could not get the materials which were inside walls and floors, such as pipes, drains, and electric conduits. This in turn delayed the concrete workers because they could not pour the concrete until the plumbing and electric installations had been made, and this in turn caused each successive group of workmen to be delayed, and as a result, plaintiff at no time was able to carry out his work program with any semblance of normalcy or eJSciency.
23. The missing materials were promised from day to day. Plaintiff sought to correct the situation by constant checking on arrivals of materials at the warehouse in order to assure that he would get his share. But even this proved unavailing because as soon as some materials arrived at the Army Base, the Government-operated projects obtained priority on truck deliveries; plaintiff had to wait for motor transportation and frequently lost the opportunity to obtain needed materials. Plaintiff partly solved this problem by getting his own truck to make deliveries so he would not have to rely on Government transportation. Plaintiff received no compensation for the costs incurred in using a truck.
24. During the progress of the work, plaintiff made numerous protests, both oral and written, to the defendant that the delay in delivery of materials was causing him damage. Under date of February 3,1944, plaintiff wrote to defendant:
Arrangements have been made for the total termination of Project W 1099 Eng. 1466 before its completion date, February 29,1944, notwithstanding the continuous .shortage of materials, from the very first day the work Started, with the corresponding disruption of progress schedules and increased cost of production.
*95 In order to adhere to this completion date, it is indispensable that the materials listed in the enclosed Exhibits A, B, and C be delivered at the site of work not later than Monday, February 7, 1944.
These materials have been requisitioned for a considerable length of time, most of them since November, 1943. Your cooperation in expediting their delivery shall prove beneficial to the development of the policy of this contractor of finishing the work within the shortest possible time, regardless of the additional expense involved.
Under date of February 5, 1944, plaintiff wrote to defendant as follows :
A number of buildings of Contract W 1099 Eng. 1466 are ready for final acceptance with the exception of a very small percentage of the electrical installation, because of the inability of your supply section to deliver, at the site of work, the materials requisitioned, as specified in the Contract.
The repeated efforts that have been made to obtain these materials have been unsuccessful.
The continuous disruption in the progress of the' electrical work, with a considerable increase in cost, and there being no indication of relief in this situation, I have concluded that the only practical way of satisfactorily solving this problem is to deduct from the amount due the contractor the value of the electrical work not performed, accepting the buildings as completed after making the pertinent deduction.
On February 10,1944, plaintiff advised defendant that 12 of the buildings were ready for final acceptance except with respect to electrical work which could not be completed because of lack of materials. On February 11, 1944, plaintiff advised defendant as follows:
In view of the fact that the repeated efforts to obtain the hardware for the sliding doors of the Radio Shelter 21K, namely, brackets, tracks, plates, hangers, channels and straps, have been unsuccessful, and that the lack of these materials is seriously interfering with the progress of the work in this building, we propose the following change, in order to enable the work to proceed: * * *
Under date of March 13, 1944, plaintiff wrote defendant as follows:
*96 In reference to contract No. W 1099 Eng. 1466 on which completion date was established as February 29, 1944, I hereby respectfully solicit an extension of time of (45) days which would extend the completion date to April 14, 1944.
Because of delays in the delivery of materials the request of the above extension of time has been considered necessary.
Under date of March 25,1944, plaintiff advised defendant as follows:
Pursuant to your letter of February 8 and conversation with Mr. B'rock, I give you below an itemized detail of electrical work not performed (because of your inability to deliver materials). * * *
It has not been possible to obtain delivery of eight lavatory faucets, which have not been installed, in the buildings detailed below: * * *
Under date of March 14,1944, plaintiff wrote to defendant as follows:
In reference to electrical and plumbing materials requisitioned on October 30, 1943, for Cold Storage Building, Q. M. Warehouse, etc., and repeated efforts made since then to obtain delivery, you are hereby notified that if the materials listed below are not delivered at the site of work by Saturday, March the 14th, an appraisal of the value of electrical and plumbing work not performed should be made, for deduction from the amount due the contractor, accepting the buildings as completed after making the pertinent deduction.
The method outlined above was approved by your letter dated February 8th, notwithstanding, it has been the spirit of this contractor to reduce the work unable to be performed (because of your inability to deliver materials), to the bare minimum.
In making the appraisal of this work it should be considered the additional expenses incurred by this contractor because of your not supplying the materials as needed, according to the contract.
25. From the commencement of the work when it became apparent that defendant could not supply necessary materials, plaintiff endeavored to reduce delays and work disruption by seeking permission from defendant’s officers to purchase the materials, which the defendant was unable to *97 furnish, from local sources in Puerto Rico, but this permission was denied. Notwithstanding defendant’s denial of permission, plaintiff went ahead on his own responsibility and purchased some materials not obtainable by the defendant and used them in and about the work. In most cases the missing material was promised daily by defendant’s officers, but in a great many instances it never materialized even after protracted delays. It finally became apparent to defendant’s officers that the defendant would not be able to supply some of the materials, and on January 8, 1944, plaintiff for the first time received authority from defendant to purchase certain needed materials which the defendant had not been able to furnish and which, it appeared, could not be furnished.
The articles which plaintiff, after protracted delays, was finally, permitted to purchase consisted primarily of glass, staples, asphalt, bolts, nails, celotex, pipe, plumbing supplies and electrical supplies. Under the supplemental agreement of March 1, 1944, plaintiff was reimbursed for the actual costs of the materials purchased by him in amount of $2,368.09.
26. Under the supplemental agreement of March 1, 1944, plaintiff was relieved from the responsibility of performing certain work with corresponding decrease in contract price of $7,522.45. The deduction of this amount from the contract price was attributable to work not performed and included electrical and plumbing work, installation of refrigeration doors, concrete foundations, installation of bath and toilet and various miscellaneous work. The reason the work was not performed was because defendant could not furnish the material necessary to perform the work. The failure of the defendant to furnish the required material even five months after the commencement of the work, prevented plaintiff from proceeding in an orderly manner with the prosecution of the work as originally contemplated under his plan of operation. The delays thus caused, disrupted plaintiff’s labor force, with consequent loss of time and efficiency, and naturally it delayed the completion of the buildings to such an extent that plaintiff could not complete the work in five months.
*98 27. The failure of defendant to furnish materials as needed, was not due to any negligence or lack of diligence on the part of defendant’s representatives at the site, but was due, chiefly, to the waning importance of the Caribbean as a priority area for defense during the progress of the work.
28. The performance of the contract was completed on April 12,1944. The plaintiff requested an extension of time of 45 days due to the shortage of materials. Such time extension was granted “due to the lack of materials and due to changes in design.”
From the evidence it appears that the contract would have been completed within the original contract time but for the lack of materials.
29. On the 5th day of July 1944 plaintiff filed a claim for damages in the sum of $30,090.53. This claim is in evidence as plaintiff’s Exhibit 17, and itemizes said sum as follows:
Additional Overhead Expense_$6,704.88
Additional Direct Labor Cost_ 12,554.94
Truck supplied by Contractor_ 2,867.47
Profit Expectancy_ 7,963.24
Total_ 30,090.53
Such damages are claimed by reason of prolongation of the work, not from and after the contract completion date, but from and after a date 90 days after the notice to proceed.
Plaintiff’s claim was denied by the contracting officer chiefly on the ground that the failure to furnish the materials was due to causes not compensable under the contract.
30.The contracting officer’s denial of the claim in writing was under date of December 28,1944. On January 18,1945, the plaintiff requested from the contracting officer an extension of time of 30 days within which to file his appeal to the head of the department. The contracting officer in writing purported to grant such an extension of time to March 2, 1945. ■
Plaintiff’s appeal to the head of the department was filed within such extended time, and the Board of Contract Appeals denied the claim on the ground (1) that the contracting officer did not have authority to extend the time for *99 appeal, and that the Board was, therefore, without jurisdiction, and (2) that it had no authority under the contract to award damages for an alleged breach of contract by the Government.
31. Plaintiff filed a release on July 6, 1944, releasing the Government from all claims and damages, except those claimed in its written claim of July 5,1944.
32. At the time proof was taken in this case, all of plaintiff’s original accounting records pertaining to the contract had been destroyed by fire, without plaintiff’s fault. However, there was in evidence an audit of the costs of the job, showing such total costs to have been $140,665.33. The contract price, plus changes, was $121,723.76. Plaintiff, however, was relieved from performing work of the agreed value of $7,522.45; so that plaintiff’s total contract price for the work done was $114,201.31. It, therefore, cost plaintiff to do the work $26,464.02 more than that for which he had contracted to do it.
Plaintiff’s estimate for the job was shown to be reasonable, and its bid was fairly comparable with the Government’s estimate, based on prompt delivery of all materials.
33. The release executed by plaintiff at the conclusion of the job released the defendant from all claims for damages, except those set forth in his claim filed on July 5,1944, which is itemized in finding 29. The additional overhead expense included in this claim is for the time to do the job in excess of 90 days. Seducing this claim to the 43 days required to complete the work in excess of the contract time of 5 months, results in $2,883.15. Reducing the claim by the excessive overhead claimed and also by the “profit expectancy,” results in a figure of $18,305.56.
CONCLUSION OF LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes that as a matter of law the plaintiff is entitled to recover, and it is, therefore, adjudged and ordered that he recover of and from the United States eighteen thousand three hundred five dollars and fifty-six cents ($18,305.56).