**J.W. POPE, Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 587–84C.

United States Claims Court.

Feb. 4, 1986.

---

James M. Johnson, Dunn, N.C., for plaintiff. Bryan, Jones, Johnson & Snow, of counsel.

Terrence S. Hartman, Washington, D.C., with whom was Asst. Atty. Gen. Richard K. Willard, for defendant. David M. Cohen, Director, and M. Susan Burnett, Asst. Director, of counsel.

## OPINION ON CROSS–MOTIONS FOR SUMMARY JUDGMENT

PHILIP R. MILLER, Judge:

The question at issue is whether the court has subject matter jurisdiction of a suit for benefits under the Department of Agriculture's 1982 federal wheat acreage reduction program, where the complaint alleges that plaintiff's failure to comply with its requisite conditions was due to his having been misled by public announcements of federal officials.

*Statement*

Plaintiff alleges in his complaint that prior to February 5, 1982, he had planted a wheat crop on 16 farms he tended in Warren County, North Carolina. On or about that date the United States Department of Agriculture, Agricultural Stabilization and Conservation Service (ASCS), through its Warren County, North Carolina, office (the Warren County Office), announced to farmers the government's 1982 Feed Grain, Rice, Upland Cotton and Wheat Program.

At the time, because of a projected record crop, new crop wheat prices in North Carolina were being quoted at $3.25 per bushel, about $.50 less than during the prior year. The program offered farmers the opportunity to obtain guaranteed support prices in excess of the quoted prices in return for reducing the acreage to be harvested for 1982 and placing the grain they harvested in reserve for up to 3 years. This was to be accomplished in the following manner:

(1) A North Carolina wheat farmer could obtain from the Commodity Credit Corporation (CCC) a nonrecourse loan with a 9 month maturity at the loan rate of $3.48 per bushel for wheat stored pursuant to the program. If at the maturity of the loan the market price did not exceed a breakeven price of $4.33 ($3.48 + $.49 interest + $.36 storage costs), he could forfeit the grain to the CCC and avoid repayment of both principal and interest.

(2) Alternatively, he could agree to participate in a 3-year reserve program at a loan rate of $3.93 per bushel. If the market price did not exceed the $3.93 plus interest and storage costs, he could likewise forfeit this grain. However, if the market price reached or exceeded a trigger price of $4.65 per bushel, the CCC would discontinue storage payments and would be entitled to accrue interest on the loan, while the farmer had to pay CCC $4.65 per bushel to redeem the grain.

To participate in the 3-year reserve program, the producer was required to reduce 1982 acreage for harvest by 15 percent and certify compliance by June 14, 1982. However, since the program was not announced prior to planting, in lieu of destruction such wheat conservation-use acreage could be used for grazing, hay or silage; but the government was to be notified of the disposition action by June 14, 1982.

Those participating in the 3-year program were eligible for the following additional benefits:

(1) Deficiency payments, which were based upon the difference between a target price of $4.05 per bushel and the average market price for the 5 months following harvest times the proven yield for the crop.

(2) Advance storage payments of $.265 per bushel per year (to be refunded to the government for periods when the market price remained above the trigger level if the loan was not redeemed).

(3) Waiver of interest by the CCC for the second and third year of the loan if the loan was not redeemed, and the market price was not above the trigger price.

Consistent with the foregoing the ASCS Notice to Farmers, dated February 5, 1982, contained the following provisions, *inter alia*:

Producers, planting * * * wheat * * * may be eligible for loans, deficiency payments, and, in certain limited instances, disaster payments.

\* \* \* \* \* \*

6. Reduced acreage of 15 percent will be required for wheat * * * for producers wishing to participate.

\* \* \* \* \* \*

8. Producers must devote to conservation uses an acreage of eligible land equal to 17.65 percent of the planted acreages of wheat * * *.

\* \* \* \* \* \*

11. Harvesting of any crop is prohibited and grazing is prohibited for the 6 principal growing months as set for the county. EXCEPTION: Acreages of wheat * * * planted prior to Janu-

ary 29, 1982 may be grazed or harvested for hay or silage, but not for grain.

\*　　\*　　\*　　\*　　\*　　\*

15. A timely and accurate report of acreages devoted to program crops is required to establish eligibility for deficiency benefits. An inaccurate report could cause loss of all program benefits for that crop.

By newsletter dated March 24, 1982, the Warren County Office notified local farmers—

Producers have just until April 16 to sign up in the 1982 acreage reduction program for wheat, corn/sorghum and barley/oats. Deciding not to sign up is an irreversible decision. It means that you will be ineligible for loans and purchases, the farmer-owned reserve, if authorized, and possible deficiency payments for that crop. After April 16, you cannot change your mind and become eligible. However, if you sign up in the program, you preserve your options. Final participation is determined by your acreage report as of the final acreage reporting date for the crop. If conditions change, there is no penalty for withdrawing.

Prior to April 16, 1982, plaintiff signed up for participation in the 1982 wheat acreage reduction program for the 16 farms he tended in Warren County. The form he signed provided in part:

PL 97–98 authorizes the feed grain, rice, wheat, and upland cotton programs. In order to administer the programs, the data requested to be provided on this form is necessary. The data will be used to determine eligibility for program payments.

Under date of May 19, 1982, the Warren County Office issued another newsletter to farmers stating:

It is important that farmers report all crops planted on their farms by *June 14, 1982.* All grain crops should be reported whether or not the farmer participated in the reduced acreage program. Farmers participating in the reduced acreage pro-

gram must report all grain planted plus conservation use acreage by *June 14* to be eligible for program benefits. For farmers who did not participate in the reduced acreage program certification will be an important factor in determining the 1983 acreage bases. (Emphasis in original.)

Noting that although farmers participating in the reduced acreage program were prohibited from harvesting their wheat on the set aside acreage but were permitted to dispose of it for grazing or harvesting for hay or silage, on June 8, 1982, plaintiff had his representative visit the Warren County Office to discuss what use he could make of the wheat crop on such acreage inasmuch as he owned no livestock. At that time the Warren County Office informed him that the final date for reporting disposition of such portion of his crop was May 15, 1982, which had come and gone, and that he was then out of compliance and ineligible for program benefits.

Plaintiff alleges in his complaint that believing and relying on what defendant's agents had told him regarding his ineligibility for benefits, he harvested his entire wheat crop. However, after such harvesting, he alleges, he discovered that defendant's agents had been negligent in advising him that he was ineligible for participation in the 1982 wheat reduction program, and that the correct reporting date was in fact June 14 rather than May 15, 1982; and plaintiff avers he fully complied with the reporting time.

After denial of his claim, plaintiff appealed the decision of the Warren County Office to the Deputy Administrator, State and County Operations, ASCS, in Washington, D.C., on the grounds that plaintiff had no notice of the May 15 final report of disposition date and that all Warren County Office publications had stated that the final date for certification of compliance was June 14, 1982. On December 8, 1982, the Deputy Administrator granted plaintiff's appeal in part, stating:

Our review of the file and a discussion with the Warren County office verified

that producers were not timely notified of the disposition date for small grain. Therefore, we have determined that applicable program benefits be allowed subject to a payment reduction. That is, the Warren County ASC Committee shall determine the net value per acre of all wheat produced on each farm. Reduce any payments for a farm by the value established times the larger of the excess wheat acreage or required conservation acreage. Mr. Pope should furnish any information as requested by the Warren County ASC Committee in order for them to make their determination.

However, the Warren County Office subsequently determined that, because plaintiff had harvested and sold his entire crop rather than stored it, he was entitled only to a deficiency payment of $2,000 but not to other benefits of the program. This determination was affirmed by the Deputy Administrator, who explained:

> It was our determination to allow "applicable program benefits" under the 1982 Acreage Reduction Program (ARP) subject to a payment reduction. You have sought to have this decision to extend to reimbursement to Mr. Pope of the difference between the loan value and the amount for which Mr. Pope sold the wheat produced on the farms.
>
> This was not a question before us at the time of our consideration of the earlier appeal. A review of the file does not indicate any representation as to whether the wheat had been sold or remained in Mr. Pope's possession. You now ask for a specific response. The determination was to allow "applicable program benefits" subject to reduction. Certainly, program benefits under the 1982 ARP included commodity loans. However, since the wheat is no longer available to pledge as collateral, such loans are not applicable. Thus, your request must be denied.

In his complaint plaintiff requests the following relief:

> Plaintiff harvested 22,822 bushels of wheat which were eligible for the pro-

gram. The average price of his wheat was $2.70 per bushel. Plaintiff was, therefore, entitled to $1.23 per bushel, being the difference between the loan value [$3.93] and his average selling price per bushel, for a total of $28,071.06 ($1.23 x 22,822 bushels). Plaintiff alleges that fifty cents per bushel deficiency payment must be added to that figure, or the sum of $11,411.06, making a total benefit due plaintiff of $39,482.06, less the "larger of the excess wheat acreage or required conservation acreage" of $9,367.88, leaving a balance due plaintiff under the program of $30,114.18.

### Discussion

Plaintiff's theories for recovery are:

1. The applicable statute entitles plaintiff to the benefit payments.

2. An implied contract was entered into prior to April 16, 1982, when plaintiff signed up to participate in the 1982 wheat production program, and breached by defendant's furnishing to plaintiff erroneous information as to the reporting and destruction date. But for such breach, plaintiff would have complied with the conditions for eligibility for program benefits.

3. The negligent actions of defendant's agents prevented plaintiff from entering into an express contract with defendant for the payments provided by the 1982 program and from taking advantage of the law.

Defendant's motion for summary judgment is based on the contention that the court lacks jurisdiction to render judgment on plaintiff's claim.

█ The parties agree that the appropriate jurisdictional statute is 28 U.S.C. § 1491(a), and the pertinent provisions therein are those authorizing the court to render judgment against the United States "founded * * * upon any Act of Congress, * * * or upon any express or implied contract with the United States." With respect to the former the crucial question is whether any federal statute "can be fairly interpreted as mandating compensation by

the federal government for the damage sustained." *United States v. Testan*, 424 U.S. 392, 400, 96 S.Ct. 948, 954, 47 L.Ed.2d 114 (1976); and *see also Eastport Steamship Corp. v. United States*, 178 Ct. Cl. 599, 607, 372 F.2d 1002, 1009 (1967).

The 1982 Wheat Program was authorized by the Agriculture and Food Act of 1981, Pub.L. No. 97–98, § 301, 95 Stat. 1213, 1221, which amended the Agricultural Act of 1949 by adding § 107B, and is codified at 7 U.S.C. § 1445b–1 (1982). This section provides for an acreage reduction program, price support, loan and purchase programs, and a farmer-owned grain reserve program. The Senate Committee report on the legislation explained its purpose in pertinent part as follows (S. Rep. No. 126, 97th Cong., 1st Sess., 74, *reprinted in* 1981 U.S. Code Cong. & Ad. News 2039):

*Cropland set-asides.*—If the USDA forecasts that supplies of wheat, feed grains, upland cotton, or rice will be excessively high relative to the demands of the market (resulting in carryover stocks larger than needed to maintain stable prices), a set-aside program can be put into effect. Under these conditions, participating farmers must withdraw cropland equal to a specified proportion of their planted acreage from production if they are to be eligible for program loans and payments. * * *

Wheat and feed grain farmers who comply with the set-aside requirements are eligible for nonrecourse loans on all their production and for direct payments on at least 80 percent of their planted acreage at assigned program yields. * *

Title 7 U.S.C. § 1445b–1(e)(3) provides:

If a set-aside program is announced * * *, then as a condition of eligibility for loans, purchases, and payments authorized by this section, the producers on a farm must set aside and devote to conservation uses an acreage of cropland equal to a specified percentage, as determined by the Secretary, of the acreage of wheat planted for harvest for the crop for which the set-aside is in effect. The set-aside acreage shall be devoted to conservation uses, in accordance with regulations issued by the Secretary.

Regulations 7 C.F.R. § 713.51(b) under this statute, similarly provide:

(b) Producers of the applicable crop or crops shall:

(1) Not knowingly exceed the permitted acreage, which is the acreage base less the required reduction; and

(2) Devote to conservation uses as prescribed in §§ 713.60 through 713.74 an acreage equal to the reduced acreage, or a proportionately smaller acreage if the planted acreage is smaller than the permitted acreage.

The ASCS found that plaintiff reported wheat acreage on each of his farms which exceeded that permitted and failed to report any conservation use acreage, and plaintiff does not dispute this. Moreover, plaintiff concedes that he harvested and sold his entire crop and did not place it in reserve and use it as collateral for loans. Thus, it is apparent that plaintiff cannot comply with the statutory and regulatory prerequisites for obtaining the loan program benefits he seeks. Under these circumstances there is no federal statute mandating the payment of compensation to plaintiff that would confer substantive jurisdiction upon this court to render judgment on plaintiff's claim.

Plaintiff argues that the determination of the Deputy Administrator of ASCS on December 21, 1982, that because plaintiff was not timely notified of the disposition date "applicable program benefits be allowed subject to a payment reduction," establishes that his claim for all of the benefits of the loan program was allowable under § 1445b–1(e)(3) and leaves open only the question as to whether the limitation by the Warren County Office to $2,000 in relief was arbitrary or capricious.

Such argument is a distortion of the Deputy Administrator's determination. The letter of December 21, 1982, did not purport to hold that plaintiff was entitled to payment under § 1445b–1(e)(3) but merely stated that "We determined to grant *some*

relief based on the lack of advice regarding the disposition date." [Emphasis supplied.] This is also made clear by the Deputy Administrator's clarification of that determination on June 10, 1983, wherein he stated that the December 21, 1982, determination was not intended to extend to plaintiff the difference between loan value and the amount for which Mr. Pope sold the wheat produced on the farms. He noted that on December 21, 1982, the ASCS had no knowledge that the wheat had been sold, and he ruled specifically that "since the wheat was no longer available to pledge as collateral, such loans are not applicable."

 The authority of the Deputy Administrator to grant limited equitable relief to a farmer despite the fact that he is not entitled to the benefits of a loan program as a matter of law may be found in 7 U.S.C. § 1445b–1(f), which provides:

(f) *Defaults; waiver of deadlines*

If the failure of a producer to comply fully with the terms and conditions of the program conducted under this section precludes the making of loans, purchases, and payments, the Secretary may, nevertheless, make such loans, purchases, and payments in such amounts as the Secretary determines to be equitable in relation to the seriousness of the failure. The Secretary may authorize the county and State committees established under section 590h(b) of Title 16 to waive or modify deadlines and other program requirements in cases in which lateness or failure to meet such other requirements does not affect adversely the operation of the program.[1]

The standard for the relief provided by this section is the determination by the Secretary that it is "equitable in relation to the seriousness of the failure." To the extent that this determination is based on the weighing of facts it is not reviewable by this court. 7 U.S.C. § 1385.[2] And see *Gross v. United States*, 205 Ct. Cl. 605, 505 F.2d 1271 (1974). And to the extent that the ultimate determination is not purely factual, the court lacks jurisdiction of a claim based therein, because the statute does not mandate compensation but only authorizes that the Secretary may grant the relief in his discretion.[3] A claim for money, the allowance of which is wholly discretionary with an executive official, cannot be the subject of a Tucker Act suit. *Adair v. United States*, 227 Ct. Cl. 345, 350, 648 F.2d 1318, 1322 (1981); *Rosano v. United States*, 9 Cl. Ct. 137, 145 (1985) (appeal pending); *Uraga v. United States*, 4 Cl. Ct. 106 (1983).

Plaintiff's contention that his complaint alleges facts sufficient to support jurisdiction as a claim founded upon an implied contract is equally without merit.

 In a series of recent cases this court has had occasion to summarize the essentials for finding an implied contract with the United States. *Nitol v. United States*, 7 Cl. Ct. 405, 415 (1985); *ATL, Inc. v. United States*, 4 Cl.Ct. 672, 675, aff'd, 735 F.2d 1343 (Fed.Cir.1984); *H.F. Allen Orchards v. United States*, 4 Cl. Ct. 601, 606 (1984), aff'd, 749 F.2d 1571 (Fed.Cir.1984), cert. denied, —— U.S. ——, 106 S.Ct. 64, 88 L.Ed.2d 52 (1985); *Pacific Gas & Elec. Co. v. United States*, 3 Cl. Ct. 329, 338–39 (1983), aff'd, 738 F.2d 452 (Fed.Cir.1984). As stated in *ATL, Inc.* such essentials are:

A contract implied-in-fact requires a showing of the same mutual intent to

---

1. Equitable determinations are made on behalf of the Secretary by the Deputy Administrator, State and County Operations, Agricultural Stabilization Conservation Service, pursuant to 7 C.F.R. § 791.2 (1985).

2. § 1385. *Finality of payments and loans; substitution of beneficiaries*
 The facts constituting the basis for * * * any payment under the wheat feed grain, upland cotton, and rice programs * * * any

loan, or price support operation, or the amount thereof, when officially determined in conformity with the applicable regulations prescribed by the Secretary or by the Commodity Credit Corporation, shall be final and conclusive and shall not be reviewable by any other officer or agency of the Government. * * *

3. That the Secretary's action was discretionary is apparent from the fact that the statute sets forth no objective standards for determining

contract as that required for an express contract. The fact that an instrument was not executed is not essential to consummation of the agreement. It is essential, however, that the acceptance of an offer be manifested by conduct that indicates assent to the proposed bargain. The requirements of mutuality of intent, and the lack of ambiguity in offer and acceptance, are the same for an implied-in-fact contract as for an express contract; only the nature of the evidence differs. The officer whose conduct is relied upon must have had actual authority to bind the Government in contract. [Citations omitted.]

None of these elements may be found in the instant case. There is no showing of mutual intent that plaintiff be entitled to loans under the Wheat Program if plaintiff has not reduced his acreage but has harvested it. Nor can any mutual intent be demonstrated that plaintiff be given the same benefits as one who has placed his grain in reserve for 3 years and used it as collateral for loans when in fact he has sold it.

Plaintiff claims that an implied contract resulted from his signing up on April 13, 1982, for participation in the 1982 wheat reduction program for the 16 farms he tended, in response to ASCS' Notice to Farmers of February 5, 1982, inviting such participation. In other words, plaintiff contends, he agreed to participate in the program in return for defendant's agreement to pay certain benefits to him.

The difficulty with plaintiff's argument is that there is no evidence in the record that plaintiff bound himself to participate in the program merely by signing up for it. The Notice of February 5, 1982, which plaintiff claims is the government's invitation, stated that reduced acreage of 15 percent will be required of wheat; that

producers must devote to conservation uses an acreage of eligible land equal to 17.65 percent of the planted acreages of wheat; and that a timely and accurate report of acreages devoted to program crops is required to establish eligibility for efficiency benefits. Clearly eligibility for benefits depended upon plaintiff's actual compliance with these requirements. Confirming that plaintiff's mere signing up did not constitute acceptance of an offer by the government may also be found in a Newsletter issued by ASCS on March 24, 1982, to Warren County Farmers, stating:

> Producers have just until April 16 to sign up in the 1982 acreage reduction programs for wheat * * *. After April 16, you cannot change your mind and become eligible. However, if you sign up in the program, you preserve your options. Final participation is determined by your acreage report as of the final acreage reporting date for the crop. If conditions change, there is no penalty for withdrawing.

Moreover, the standard forms plaintiff executed on April 13, 1982, which plaintiff alleges contained his acceptance of the government's offer merely provided that it "will be used to determine *eligibility* for program payments" [emphasis supplied].

Plaintiff's argument that he was misled into noncompliance with the wheat reduction program by the negligent misrepresentation of government personnel cannot provide a basis for jurisdiction in this court. Even if true, 28 U.S.C. § 1491(a) limits the jurisdiction of this court to cases "not sounding in tort."

Plaintiff contends that even if this court lacks jurisdiction of the claim, it should not be dismissed but should be transferred to a court that does have jurisdiction, pursuant to 28 U.S.C. § 1631.[4]

what is "equitable in relation to the seriousness of the failure" and no procedural requirements for determining it, and there is no established case law construing the phrase. *See Montgomery Ward & Co. v. Zenith Radio Corp.,* 673 F.2d 1254, 1261 (CCPA), *cert. denied sub. nom. Zenith Radio Corp. v. United States,* 459 U.S. 943, 103

S.Ct. 256, 74 L.Ed.2d 200 (1982), and *see also Citizens To Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 415–17, 91 S.Ct. 814, 823–24, 28 L.Ed.2d 136 (1971).

**4.** § 1631. Transfer to cure want of jurisdiction
Whenever a civil action is filed in a court as defined in section 610 of this title or an ap-

■ Plaintiff asserts that a federal district court may have jurisdiction of the claim under the Administrative Procedure Act, particularly 5 U.S.C. § 702, which provides that "A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statue, is entitled to judicial review thereof." However, for a variety of reasons it is now clear that § 702 does not confer jurisdiction on any district court over the claim here asserted. First § 701(a) provides that the right of review provided by § 702 does not apply where "agency action is committed to agency discretion by law." Second, § 702 itself provides that nothing therein "confers authority to grant relief if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought." Title 28 U.S.C. § 1346, which grants consent to suit for a money judgment against the United States in a district court contains the same jurisdictional limitations as those applicable to this court in § 1491, plus the additional one that the claim may not exceed $10,000 in amount. Finally, there is now clear precedent that § 702 is not a jurisdictional statute and does not confer jurisdiction on a court not already possessing it. *Califano v. Sanders*, 430 U.S. 99, 104–07, 97 S.Ct. 980, 983–85, 51 L.Ed.2d 192 (1977); *American Air Parcel Forwarding Co. v. United States*, 718 F.2d 1546, 1552 (Fed.Cir.1983), *cert. denied*, 466 U.S. 937, 104 S.Ct. 1909, 80 L.Ed.2d 458 (1984).

■ Plaintiff also suggests that authority for district court jurisdiction may be found in 28 U.S.C. § 1361, which provides that "The district courts shall have original jurisdiction of any action in the nature of mandamus to compel an officer or employee of the United States or any agency

thereof to perform a duty owed to the plaintiff." But this statute confers jurisdiction only to require performance of nondiscretionary acts. *Einhorn v. Dewitt*, 618 F.2d 347, 349 (5th Cir.1980); *Short v. Murphy*, 512 F.2d 374, 377 (6th Cir.1975). As the court stated in *Short (id.):*

The District Courts are vested with original jurisdiction under 28 U.S.C. § 1361 of "any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff." This language has been construed uniformly to mean that mandamus will not lie unless the alleged duty imposes a mandatory or ministerial obligation. If the alleged duty is discretionary or directory, the duty is not "owed."

■ Moreover, § 1361 does not confer jurisdiction to mandamus payment of an unliquidated claim for money damages, as this would nullify the limitations on jurisdiction of such claims set forth in §§ 1346 and 1491. *See Spaulding v. Nielsen*, 599 F.2d 728 (5th Cir.1979); *United States v. Commonwealth of Pennsylvania*, 394 F. Supp. 261, 263–65 (M.D. Pa.1975).

### Conclusion

For the foregoing reasons, judgment is to be entered in favor of defendant, dismissing plaintiff's complaint.

peal, including a petition for review of administrative action, is noticed for or filed with such a court and that court finds that there is a want of jurisdiction, the court shall, if it is in the interest of justice, transfer such action or appeal to any other such court in which the action or appeal could have been brought at

the time it was filed or noticed, and the action or appeal shall proceed as if it had been filed in or noticed for the court to which it is transferred on the date upon which it was actually filed in or noticed for the court from which it is transferred.