**Jack POLLACK and Menomonee Enterprises, Inc., Plaintiffs,**

v.

**The UNITED STATES, Defendant.**

**No. 87–86C.**

United States Claims Court.

July 20, 1988.

Richard J. Steinberg, Brookfield, Wis., for plaintiffs.

J. Keith Burt, Washington, D.C., with whom was Asst. Atty. John R. Bolton, for defendant.

## OPINION

FUTEY, Judge.

This government contract action comes before the court on defendant's motion for summary judgment, filed on April 1, 1987. The plaintiffs initiated this action on March 31, 1986, and seek both continuing monetary relief and the total of costs, disbursements and attorney's fees for this action. Plaintiffs claim that either express contracts are in effect, or that defendant continually misled and promised them that their contracts would be renewed, thereby creating implied-in-fact contracts. Defendant asserts that by the terms of the original contracts no express contracts continue to exist, and that implied-in-fact contracts cannot exist since any promises that may have been made to plaintiffs were made by government employees who lacked the authority to bind the government. For the reasons discussed hereinafter, defendant's motion for summary judgment is granted.

### *Factual Background*

The plaintiffs in this action are Mr. Jack Pollack, a Wisconsin resident, and Menomonee Enterprises, Inc., of which Mr. Pollack is president. Mr. Pollack entered into a housing assistance payments (HAP) contract (No. WI39–0046–001) with the Department of Housing and Urban Development (HUD) on September 1, 1978. Previously, Menomonee Enterprises, through Mr. Pollack, entered into two separate HAP contracts (No. WI39–0046–016, WI39–0046–0017) with the defendant on August 23, 1978.

The purpose of a HAP contract is to provide federal financial assistance to qualified low-income families. These payments are made directly to the property owner who then credits the amount against the total rent due from the qualifying tenants. Plaintiffs submitted proposals to HUD to

receive financial assistance for certain tenants under § 8 of the United States Housing Act of 1937, 42 U.S.C. § 1437f. After satisfactory completion of the proposals and subsequent HUD acceptance, a HAP contract was executed. Although a variable length of time is available on most HAP contracts, plaintiffs' contracts specifically stated that the contracts were for a maximum period of five years.[1]

The plaintiffs allege three separate instances in which they received oral or written promises from HUD concerning the renewal of the HAP contracts:

(1) The plaintiffs received three "Survey" letters from HUD employee Mr. Elmo Turner on April 20, 1982. Mr. Turner was at that time the Deputy Director of Housing Management. The letters received by plaintiffs were sent to all owners, a majority of whom had renewable contracts, unlike the plaintiffs. Among other things, the letters stated that if the owner decided to renew his HAP contract, he should check Box "A". The second page of the letters stated that the owner's responses "were not binding on you or your department."[2]

(2) In May or June of 1983, Howard Goldstein, plaintiffs' employee, telephoned Gary Bowen of HUD's Assisted Housing Staff. Mr. Goldstein called to inquire about the disposition of a few tenants whose terms were to extend beyond the termination of the HAP contracts. The plaintiffs allege that Mr. Bowen informed them that nothing should be done since HAP contracts are automatically renewed. Defendant acknowledges that a conversation took place but cannot recall the substance of the conversation.

(3) On August 22, 1983, shortly before the three HAP contracts were to terminate, plaintiffs received a rental increase form from Mr. Perryman, an employee of the Assisted Housing Management Branch of HUD. A subsequent letter received from Ms. Broyles, Deputy Director of Housing Management, granted the plaintiffs a rental increase. Realizing a mistake had been made, Ms. Broyles immediately proceeded to notify plaintiffs by letter dated September 16, 1983, that the rental increases would not be forthcoming since their HAP contracts had already expired.

The plaintiffs were under the mistaken impression that their HAP contracts would be renewed, and did not proceed to rent the dwellings to other tenants. Thus they allege continuing damages in the amounts of $6,711/month for Mr. Pollack and $1,400/month for Menomonee Enterprises, Inc.

### Discussion

■ Plaintiffs claim that express contracts exist between the parties, as evidenced by the HAP contracts. The controlling sections of the HAP contracts, which the plaintiffs admittedly did not read, are § 1.1b and § 1.4a. Section 1.1b specifically states that "The term of this Contract for any unit ... shall be 5 years [not to exceed five years] ...", while section 1.4a states that "The term of this Contract for any unit shall be as stated in section 1.1b, with *no option for renewal* in either party."[3] (Emphasis added). These terms are unambiguous, and lend themselves to no other interpretation but that the written contracts dated August 23 and September 1, 1978 expired on August 23 and September 1, 1983. Accordingly, the express contracts which the parties entered into in 1978 ceased to exist in 1983.

■ Plaintiffs also claim that if an express agreement does not exist, then implied-in-fact contracts were created by the actions of the parties between April 1982 and August 1983. The elements of an implied-in-fact contract are identical to those of an express contract: offer, acceptance, consideration and mutuality. *Fincke v. U.S.*, 675 F.2d 289, 230 Ct.Cl. 233 (1982). Moreover, when the federal government is

---

1. Housing Assistance Payment Contract C–78–908, § 1.1b. (Defendant's Exhibit 13).

2. Renewal of HAP Contract letter, HUD Housing Management. (Defendant's Exhibit 31).

3. Housing Assistance Payment Contract C–78–908, § 1.1b, § 1.4a. (Defendant's Exhibit 13).

involved there is an additional caveat: the government can only be bound in contract by an employee having actual authority to enter into a contract on behalf of the government. *Federal Crop Insurance Corporation v. Merrill,* 332 U.S. 380, 384, 68 S.Ct. 1, 3, 92 L.Ed. 10 (1947). It is a well recognized rule that "anyone entering into an arrangement with the government takes the risk of having accurately ascertained that he who purports to act for the government stays within the bounds of his authority." *Prestex v. U.S.,* 3 Cl.Ct. 373, 377 (1983). The actual authority doctrine is just as applicable to implied-in-fact contracts as it is to express contracts, as this court has recently affirmed in *Pope v. U.S.,* 9 Cl.Ct. 479 (1986), *Nitol v. U.S.,* 7 Cl.Ct. 405 (1985).[4]

■ The threshold question, therefore, is whether the plaintiffs contracted with any government employees who had actual authority to bind the government. 24 C.F.R. § 200.118(c) sets forth which HUD officials are authorized to enter into binding contracts for the government. The only officials included in this section are the HUD Area Directors and the HUD Deputy Directors for those areas. The directors of the various subdivisions, such as Housing Management, are not included and therefore do not have the authority to bind the government. None of the officials plaintiffs dealt with in 1982 and 1983 were HUD Area Directors or HUD Deputy Directors. Accordingly, they had no authority to bind the government, and no implied-in-fact contract could arise based on plaintiffs' dealings with them.

### Conclusion

For the reasons stated hereinabove, the court finds that plaintiffs have not established the existence of any contracts with the government, either express or implied-in-fact, after August/September 1983. Accordingly, defendant's motion for summary judgment is hereby granted.

The Clerk is directed to dismiss plaintiffs' complaint. No costs.

---

**4.** Plaintiff cites two cases in an attempt to circumvent the actual authority requirement, *Rafael Torres, Jr. v. United States,* 126 Ct.Cl. 76, 112 F.Supp. 363 (1953), *MacDougald Construction Co. v. United States,* 122 Ct.Cl. 210 (1952), but neither of these cases involved the issue of actual authority to bind the government.