Littleton, Judge,
delivered the opinion of the court:
These are Congressional reference cases involving identical parties and claims and were consolidated for proceedings in this court. They were the subject matter of Senate Bill 982 and House of Representatives Bill No. 1598 both of the 81st Congress and were referred to this court by Senate Resolutions 152 and 165 of that Congress with instructions to proceed in accordance with sections 1492 and 2509 of title 28 of the United States Code, 1946 Ed., as amended.[1]
Said bills provide for the granting of relief to one Thomas F. Harney, Jr., doing business as the Harney Engineering Co., hereinafter referred to as Harney, for alleged losses suffered by him as the plumbing and heating subcontractor under two lump sum contracts between the defendant, acting *66 through the Army Quartermaster Corps, and D. A. Sullivan & Sons, Inc., hereinafter referred to as Sullivan, which provided for the construction of building installations including 30 barracks at Fort Devens, Massachusetts, during the fall and winter of 1940-41.
Sullivan, although listed in the petitions as a plaintiff, has entered no appearance in these proceedings nor has any claim been asserted on his behalf.
Harney asks the recovery of $21,088.21. While this amount is made up largely of claims for the performance of alleged extra work, it likewise includes claims for the value of dismantled lumber from Harney’s field office and work shop which was taken and used by soldiers at the camp, and for the return of $441.25 which was charged against him as his share of the liquidated damages assessed against Sullivan for delay in the completion of the contract work.
Sullivan’s contracts contained the standard contract provisions found in all Government construction contracts, which provisions were incorporated by reference with only minor modifications into Harney’s subcontracts. Findings 6 and 7.
The alleged extra work resulted as changes became necessary during the progress of the work. Harney performed this extra work under verbal instructions from Sullivan with the knowledge of defendant’s representatives and although this work was approved and accepted by the defendant’s supervisory engineer no change orders as contemplated by Articles 3 and 4 were ever issued to cover the work. This was so despite efforts by Harney to secure written instructions in advance, and his prompt submission of the costs to Sullivan after the completion of the work necessitated by the changes.
On June 30,1941, Sullivan executed releases on both prime contracts reserving certain items for future claim, among which were the items, with the exception of one, upon which Harney bases his claims here. This one exception was the charge against Harney of $441.25 in liquidated damages.
On September 15, 1941, Sullivan submitted to the War Department a claim for excess labor costs totaling $18,996.51. This claim was referred to the General Accounting Office *67 and upon the recommendation of that office Congress enacted a bill providing for payment to Sullivan of $14,481.87 in satisfaction of this claim. Harney’s share of that amount was $4,314.16.
Again on January 9,1942, Sullivan filed additional claims with the War Department. These claims dealt with extra work and included on behalf of Harney a claim for $17,768.74. While those portions of the claims filed by Sullivan on his own behalf were settled, those of Harney were never acted upon nor were they referred to the General Accounting Office. No explanation for this inaction has ever been given. It is those claims which Harney has asserted in these proceedings.
On March 2, 1943, Harney settled with Sullivan receiving for his work under the subcontracts $94,802; under change orders which were issued he received $5,997.15 and as his share of the labor claim settlement referred to above he received $4,314.16.
Unsuccessful in his efforts to secure a satisfactory settlement in the War Department through Sullivan, Harney went to Congress on his own behalf. During the pendency of his claims before Congress, the Secretary of the Army informed the Judiciary Committee of the House that the War Department was “not opposed to further examination and adjustment,” provided payment to Harney did not exceed $17,-767.86. The Secretary went on to point out, however, that the Army’s investigation because of the inadequacy of Har-ney’s cost records failed to develop to what extent, if any, the claims were based on costs incurred in performing extra work. The bill then before the House was amended to provide for payment of $17,767.86. The bill, as amended, passed the House and upon its presentation to the Senate was referred to this court along with a similar bill pending in the Senate.
Harney’s claims have been broken down into 16 separate items and are set-out with the amounts found chargeable to each in our findings 13 through 28. None of these items of claim were covered by change orders or paid.
The defendant has raised several legal defenses, any one of which is sufficient to prevent legal recovery in this court. The first of these is the statute of limitation. Any claim *68 which. Harney or Sullivan may have under the contracts as against the Government arose at the very latest on June 30, 1941, when the releases were executed. Since the claims were not referred to the court until July and September of 1949, and the petitions were not filed until February 15, 1950, all claims are barred by the six-year limitation of 28 U. S. C. 2501. This bar likewise applies to the loss of the dismantled lumber even though that claim is not one under the contracts.
The lack of privity of contract between the defendant and Harney bars the claims as well. Harney as a subcontractor has no independent cause of action against the Government and any legal right which he might assert against the Government would have to be made on his behalf by Sullivan. H. Herfurth, Jr., Inc. v. United States, 89 C. Cls. 122, 127. Thus any defense which would be effective against Sullivan would bar Harney as well. Sullivan entered no appearance in these proceedings and even if he did he would be barred at the outset because of his failure to adhere to or to even initiate the relief provisions of the contracts. United States v. Holpuch, 328 U. S. 234, 240; United States v. Blair, 321 U. S. 730, 736.
As for the $441.25 in liquidated damages assessed against Harney, that claim is further barred because it was not excepted from the releases as were the other claims. Torres v. United States, 126 C. Cls. 76.
Then too, certain of the claimed items of extra work (findings 21, 22 and 23) arose because of a misunderstanding as to the proper interpretation of' particular specifications. Mr. Harney’s interpretations were overruled by defendant’s supervisory engineer and as a result of changes which then had to be made, Harney’s costs were increased. Sullivan did not appeal those rulings by the supervisory engineer. Since under the contracts (finding 6) the interpretation of the supervisory engineer was to be controlling, any work done in accordance with those rulings must be held to have been work contemplated under the contracts. United States v. Moorman,, 338 U. S.457.[2]
*69 The loss of the lumber from the dismantled field office and work shop although, as mentioned above, not one arising under the contracts is likewise a loss which cannot be recouped in this court. The lumber was taken by soldiers at the camp and used by them in building fires which is understandable when it is remembered that they were living in tents in Massachusetts during the winter awaiting the completion of these barracks. That use, however, was in the nature of a tortious taking, and this court, of course, has no original jurisdiction over tort claims.
Other than the legal objections pointed out above, defendant has resisted Harney’s recovery on the question of proof, contending that his records are not susceptible to an audit to determine his excess costs, and that efforts in the past by the Army to audit Harney’s books have proved futile because of the inadequacy of his cost records. Presented in the proceedings in this court with his first opportunity to fully present his claims, Harney has overcome this obstacle. The commissioner of this court on the basis of the testimony and records introduced found that Harney performed work valued at $13,439.84 on the buildings at Fort Devens for which he was not compensated. Included in this figure in addition to labor and material costs are allowances of 10% for job supervision, 15% for overhead and 10% for profit.[3] These additions were common practice in the trade and were reasonable for the types of work performed. All items of cost are supported by documentary evidence with the exception of two. These are the sums of $400 and $1,392 found to be the labor costs allocable to the work dealt with in findings 16 and 25 respectively. Both figures are found to be fair and reasonable on the evidence presented. Eastman Kodak Company v. Southern Photo Company, 273 U. S. 359, 379.
The difference in our figure and that claimed by Harney stems largely from the fact that portions of his claims, notably those dealing with changes in the mess hall (finding 13) were found to be covered by those change orders which were issued, and that a portion of the excess labor costs *70 claimed here were recouped by Harney as part of his share ($4,314.16) of a settlement for extra labor costs which Sullivan had made with the defendant.
Neither the Army nor the defendant here has ever contended that the work upon which the claims are based was not performed or that the Government did not derive a benefit from it. However, in giving consideration to the equitable nature of Harney’s claims, as section 2509, supra, requires, it must be pointed out that his first recourse, other than for the loss of the lumber, was against the prime contractor, Sullivan. In order to provide a more suitable remedy for those who may find themselves in Mr. Harney’s position, prime contractors were at the time of the award of the contracts in question required, in conformity with 40 U. S. C. 270a, 49 Stat. 793, to execute, in addition to the customary performance bond, a payment bond the purpose of which was to operate for the “protection of all persons supplying labor and material in the prosecution of the work provided for in said contract * * A subcontractor may maintain an action against his prime contractor on that bond. See United States for the Use and Benefit of W. A. Rushlight Co. v. Davidson, 71 F. Supp. 401; MacEvoy Co. v. United States for the Use and Benefit of Calvin Tomkins Co., 322 U. S. 102.
These bonds covering the work under the first contract, the larger of the two, were presented in evidence, but neither the payment bond nor the performance bond which Sullivan was required to execute in connection with the second contract was presented. A proceeding against Sullivan and his surety under the payment bond or against Sullivan alone was an “established legal remedy” which Harney evidently did not exercise nor has he offered in these proceedings an explanation for not having done so as contemplated by section 2509, supra.
Apparently both believed that a settlement satisfactory to all concerned could be achieved without resort to the appeal provisions of the contract or the necessity for the instituting of proceedings by Harney against Sullivan. While the latter did obtain two settlements with the Government after completion of the contract work, and prior to settlement *71 with Harney, which evidently satisfied his claims, Harney’s portions thereof failed to fully compensate him for all his expenses.
As already mentioned the claim for the loss of the lumber not being one under the contracts but a tortious taking is a claim which Harney is legally entitled to assert directly against the Government. If not for the bar of the statute of limitation and the lack of jurisdiction of this court over tort claims, Harney would be entitled to a judgment for the value of the lumber which we find to be $290. Finding 27. As a matter of equity he is entitled to that amount.
The charge of $441.25 had been deducted by Sullivan from his settlement with Harney as the latter’s one-half share of the $882.50 in liquidated damages which had been assessed against Sullivan by the Government for delay in completion of the work under the contracts. While the facts (finding 28) show quite clearly that no delay in completion was chargeable to Harney’s work, there is nothing to indicate that the Government was not entitled to assess the damages against Sullivan. His failure to except it from the releases supports such a view. The charging of half that amount against Harney appears to have been an arbitrary determination on Sullivan’s part and does not represent a loss which Harney can with any merit assert against the Government.

Conclusion

We find no legal obligation on the part of the Government to compensate Harney for any of the claims presented. As pointed out above, merely lifting the bar of the statute of limitation would not operate to create such an obligation in the face of the other defenses, notably the lack of privity of contract insofar as the claims under the contracts are concerned.
Operating against an equitable right of recovery on behalf of Harney is his failure to pursue his remedy against the prime contractor and his failure here to explain why he failed to do so. This, of course, does not apply to the loss of the lumber which we recommend to Congress as representing an equitable claim in the amount of $290 against the Government.
*72 That is not to say, however, that there is a complete lack of merit in plaintiff’s claims based on the extra work. It is not disputed that the Government derived a benefit from it. During the attempts at settlement with the War Department it appears that Harney’s chief obstacle was his inability to substantiate the costs chargeable to the extra work. This obstacle has been erased here, and on the basis of our findings, Congress may in the exercise of its discretion desire to reimburse Harney for that portion of his excess costs, $13,-439.84, which we have found to be substantiated. Findings 13 through 26. The several items making up this sum of $13,439.84 are meritorious, and we recommend reimbursement of plaintiff in this sum of $Í3,439.84. This recommendation, however, is directed entirely to the discretion of the Congress.
This opinion and the findings of fact together with the conclusions therein will be certified to Congress pursuant to Senate Resolutions 152 and 165 of the 81st Congress, 1st Session.
Madden, Judge; Whitaker, Judge; and Jones, Chief Judge, concur.
Laramore, Judge, took no part in the consideration or decision of this case.
FINDINGS OF FACT
The court, having considered the evidence, the briefs and argument of counsel, and the report of Commissioner C. Murray Bernhardt, makes the following findings of fact:
1. a. Plaintiff D. A. Sullivan and Sons, Inc. (hereafter referred to as Sullivan), a Massachusetts corporation, asserts no claim in this proceeding and did not participate in the hearing, but was the prime contractor with the United States in the contracts concerned.
5. Plaintiff Thomas F. Harney, Jr. (hereafter referred to as Harney), a United States citizen residing and doing business in Worcester, Massachusetts, under the name of Harney Engineering Company, was the plumbing and heating subcontractor under prime contracts between Sullivan and the United States. He claims $21,088.21 for the performance of *73 extra work not called for under the original contracts, or covered by change orders, or otherwise compensated for.
2. Both claims reported herein represent the same cause of action, request duplicate relief and were consolidated for trial. They were the subject matter of Senate Bill No. 982 and House of Representatives Bill No. 1598, both of the 81st Congress, which were referred to this court by Senate Resolutions 152 and 165, respectively, of the same Congress, with instructions to—
* * * proceed with the same in accordance with the provisions of sections 1492 and 2509 of title 28 of the United States Code and report to the Senate, at the earliest practicable date, giving such findings of fact and conclusions thereon as shall be sufficient to inform the Congress of the nature and character of the demand as a claim, legal or equitable, against the United States and the amount, if any, legally or equitably due from the United States to the claimant.
3. By letter dated July 28,1948, the Secretary of the Army advised the Committee on the Judiciary, United States House of Representatives, which was then considering earlier private legislation for the relief of Harney, that the Army was “not opposed to further examination and adjustment by the Comptroller General of claims submitted by D. A. Sullivan and Sons, Inc., on behalf of Harney Engineering Co., provided payment does not exceed $17,767.86,” however, the Secretary went on to inform the Committee that, an examination by the Army had failed to determine “to what extent, if any, such costs were incurred in performing extra work.”[4] Thereafter, Harney advised the Committee that he was “willing to accept the sum of $17,767.86 at this time in full settlement of my claims even though my principal loss will amount to an even greater sum if I receive payment in this amount.”
4. Contract W-6101-qm-127 (hereafter referred to as contract 127), entered into August 23, 1940, between Sullivan and defendant through the Construction Division of the Army Quartermaster Corps, provided for the construction at Fort Devens, Massachusetts, of 20 barracks, a mess hall *74 and six other buildings for $254,548 (later increased by change orders to $273,368.13). The appropriate bonds as required by 40 U. S. C. 270a, 49 Stat. 793, were executed by Sullivan on September 18,1940. The original contract completion date of November 21, 1940, was extended by change orders to December 29, 1940, and the contract was accepted as complete May 9,1941.
5. Contract W-6101-qm-150 (hereafter referred to as contract 150), entered into September 21,1940, between the same parties, provided for the construction at Fort Devens, Massachusetts, of 10 additional barracks and one storehouse for $129,361 (later decreased by change orders to $123,325.32). The original contract completion dates of November 21,1940, for the barracks and December 20, 1940, for the storehouse, were extended by change orders to December 26, 1940, and the contract was accepted as complete April 30, 1941.
6. Both contract 127 and contract 150 provided:
Article 2. Specifications and drawings. — The Contractor shall keep on the work a copy of the drawings and specifications and shall at all times give the contracting officer access thereto. Anything mentioned in the specifications and not shown on the drawings, or shown on the drawings and not mentioned in the specifications, shall be of like effect as if shown or mentioned in both. In case of difference between drawings and specifications, the specifications shall govern. In any case of discrepancy in the figures, drawings or specifications, the matter shall be immediately submitted to the contracting officer, without whose decision said discrepancy shall not be adjusted by the contractor, save only at his own risk and expense. The contracting officer shall furnish from time to time such detail drawings and other information as he may consider necessary, unless otherwise provided. Upon completion of the contract the work shall be delivered complete and undamaged.
Article 3. Changes. — The contracting officer may at any time, by a written order, and without notice to the sureties, make changes in the drawings and/or specifications of this contract and within the general scope thereof. If such changes cause an increase or decrease in the amount due under this contract, or in the time required for its performance, an equitable adjustment shall be made and the contract shall be modified in writing accordingly. No change involving an estimated in *75 crease or decrease of more than Five Hundred Dollars shall be ordered unless approved in writing by the head of the department or his duly authorized representative. Any claim for adjustment under this article must be asserted within 10 days from the date the change is ordered : Provided, however, That the contracting officer, if he determines that the facts justify such action, may receive and consider, and with the approval of the head of the department or his duly authorized representative, adjust any such claim asserted at any time prior to the date of final settlement of the contract. If the parties fail to agree upon the adjustment to be made the dispute shall be determined as provided in Article 15 hereof. But nothing provided in this article shall excuse the contractor from proceeding with the prosecution of the work so changed.
$ * ‡ $
Article 5. Extras. — Except as otherwise herein provided, no charge for any extra work or material will be allowed unless the same has been ordered in writing by the contracting officer and the price stated in such order. * * * * *
Article 15. Disputes. — Except as otherwise specifically provided in this contract, all disputes concerning questions of fact arising under this contract shall be decided by the contracting officer subject to written appeal by the contractor within 30 days to the head of the department concerned or his duly authorized representative, whose decision shall be final and conclusive upon the parties thereto. In the meantime the contractor shall diligently proceed with the work as directed.
*****
GC-8. Liability for Damages: The contractor will be held responsible for all damage to the work under construction * * *. He will be held answerable for all damages that may occur to persons, property, animals, or vehicles from want of proper * * * watching, * * *.
* * Jfc ❖ £
GC-15. Interpretation of Oontract: Unless otherwise specifically set forth, the contractor shall furnish all materials, labor, etc., necessary to complete the work according to the true intent and meaning of the drawings and specifications, of which intent and meaning the C. Q. M. shall be the interpreter. * * *
$ $ $ $ $
GC-20. Protection of material and worh: The contractor shall, at all times, carefully and properly protect *76 all materials of every description, both before and after being used on the job. * * *
$ # $ ❖ *
GC-31. Laying out work; The contractor must lay out his work. He shall be responsible for measurements. He must exercise proper precaution to verify the figures before laying out the work and will be held responsible for any errors therein that otherwise might have been avoided. He shall promptly inform the C. Q. M. of any errors or discrepancies he may discover in the drawings and specifications, in order that the proper corrections may be made and understood. * * *
$ $ $ * $
SC-2. Liquidated Damages: If the contractor delays the completion of the work under this contract beyond the time of completion stated in the contract, then the contractor shall pay the United States as fixed, agreed and liquidated damages the amount of Two and One-Half Dollars ($2.50) per building, per calendar day of delay, until the work is completed or accepted, subject to the provisions of Article 9 of U. S. Government Contract Form No. 23, Revised Sept. 9,1935.
7. Thereafter Harney entered into two subcontracts with Sullivan, one of them undated and the other dated September 17, 1940. The first provided for performance by Har-ney of all plumbing and heating work required by specifications P1-H21 under contract 127 for $61,200. The other provided for performance by Harney of all plumbing and heating work required by contract 150 and certain additional plumbing and heating work under contract 127, in accordance with the plans and specifications of the prime contracts, for $33,602. Each subcontract incorporated by reference the drawings and specifications of the prime contract to which it related, and provided:
Section 5. * * * The Subcontractor agrees—
(a) To be bound to the Contractor by the terms of the Agreement, General Conditions, Drawings and Specifications, and to assume toward him all the obligations and responsibilities that he, by those documents, assumes toward the Owner.
* ❖ # # *
(c) To make all claims for extras, for extentions of time and for damages for delays or otherwise, to the *77 Contractor in the manner provided in the General Conditions for like claims by the Contractor upon the Owner, except that the time for making claims for extra cost is one week.
8. a. Formal change orders to contracts 127 and 150 effected a net increase of $6,102.15 in Harney’s subcontracts. The extra work constituting the present claim was performed by Harney under verbal instructions from Sullivan with the knowledge of defendant’s representatives (although Harney had unsuccessfully sought written instructions from Sullivan in advance), was approved and accepted by defendant’s supervisory engineer, but was not covered by change orders. After completion of the extra work Harney, with reasonable promptness, submitted to Sullivan a statement of the cost of the extra work performed.
b. On March 2,1943, Sullivan settled with Harney. Sullivan paid Harney $100,799.15 for the work performed by Harney under the subcontracts ($94,802) and change orders relating thereto ($5,997.15). Sullivan also paid Harney $4,314.16 as the latter’s share of a larger sum received by Sullivan from defendant in settlement of a claim for extra labor (see Finding 29, infra).
9. Releases executed on June 30, 1941 by Sullivan to defendant on both prime contracts reserved certain items for future claim, among which the following related to extra work done by Harney under his subcontracts:
Extra labor and material on plumbing and beating_$15,198.39
Substitution of fixtures_ 2, 349.16
Changes in duct work (20 barracks)_ 1,207.40
18, 754. 95
10.a. On January 9, 1942, Sullivan filed with the War Department a claim for $32,942.49, which included, on behalf of Harney, $17,768.74 for extra work. While the claims filed by Sullivan on its own behalf were settled, those relating to the extra work performed by Harney were never acted on by the War Department nor were they referred to the General Accounting Office. They constitute the claims in this proceeding.
*78 b. The record contains no findings of the contracting officer as to any item of Harney’s claim, and there is no indication that such findings were made or requested.
11. a. Harney’s records as to material used in the performance of the subcontracts are imperfect. Supplies used were purchased in bulk and cut to fit particular installations, were inventoried in place, and sales invoices covering the purchases were missing in most cases. While records of Harney made in the regular course of business established the type and quantity of supplies used in performing the extra work, the costs assigned to most of the supplies in succeeding findings represent the net cost to persons such as Harney in the plumbing trade at that time and in that area. Such net costs were standardized in the trade, and are reasonable costs of the supplies used by Harney in the performance of his subcontract.
b. To the direct costs of material (excluding fixtures and equipment) and labor in each item of Harney’s claim, except where otherwise indicated, there has been added in succeeding findings 10% of such direct costs for job supervision,[5] 15% of total job costs for overhead, and 10% of total costs[6] for profit. These additions were common practice in the trade and were reasonable for the types of work performed. Harney’s total costs amount to 90.9% of the amounts found and reported herein for extra work, the balance representing the profit claimed.
g. The cost of direct labor in the succeeding findings includes 6.99% to cover payroll taxes and insurance paid by Harney. “
d. None of the items of claim enumerated in succeeding findings were covered by change orders or paid.
12. The principal changes in the original contracts involved the enlargement of the mess hall to accommodate 1,500 men instead of 1,000 men. At the outset of the contracts soldiers were encamped at Fort Devens in tents. As cold weather approached the defendant’s representatives requested that the work on the barracks be accelerated and that they be completed for occupancy ahead of schedule to provide suit *79 able shelter for the soldiers. The work in the 20 barracks under contract 127 was accelerated by Sullivan and Harney and they were occupied by soldiers on the following dates:
5 barracks on November 3, 1940
5 barracks on November 6, 1940
10 barracks on November 17, 1940
The advancement of the work on the barracks necessitated the substitution of many plumbing and heating fixtures and equipment then on order for 10 of the barracks with other equipment available for immediate delivery, so that the installations could be made without delay. The occupancy of the barracks ahead of schedule interfered with the normal performance of additional work required in these buildings, but the increased cost occasioned thereby was indeterminable and no claim was made.
13. Changes in mess hall. — After substantial completion of the plumbing and heating work for the mess hall, the Government ordered changes in its construction and equipment (Finding 12, supra). Harney submitted and defendant rejected estimates for the plumbing and heating work required by the changes. Thereafter Harney proceeded with the extra work under oral instructions from Sullivan and with the knowledge and acquiescence of defendant’s representatives, performing some work in addition to that contained in his estimate. Later defendant issued change orders covering most, but not all, of the extra work performed by Harney. The total cost of extra work by Harney in connection with changes made in the mess hall was $6,602.68.[7] Having previously recovered $5,696.33 through prior change orders, and $523.83 through settlement of the labor claim applicable to such changes (see Finding 29, infra), the net amount of the unreimbursed extra work performed by Hamey on the mess hall was $382.52.
14. Tending furnace in mess hall. — When Harney received verbal orders for the extra work in the mess hall, although the contract required him to maintain heat in the boilers for only 24 hours for testing purposes, at Sullivan’s request and with the defendant’s knowledge and acquiescence, he con *80 tinued to furnish heat for two weeks thereafter to protect the work and workers, thereby facilitating completion of the work. Although it had been requested by Harney at completion of the boiler tests to take over and maintain the heating system thereafter, defendant failed to do so until Harney drained the system and withdrew his personnel. Exclusive of certain excess labor costs previously recovered by Harney, his costs in maintaining the heating system for the period following completion of the boiler tests were $694.79.
15. Replacement of vacuum steam pump. — A vacuum pump supplied by Harney agreed with specifications and was approved by defendant’s representative, but had to be substituted by Harney for another type because of changed conditions. This change cost Harney $189.36.
16. Substitution of fixtures and materials for first 10 barracks. — Plumbing fixtures for 10 barracks were ordered by Harney for delivery during the first week of November 1940. In order to house troops who were living in tents in the area, defendant ordered Sullivan and Harney to advance the completion dates. Harney was unable to obtain advanced delivery of the plumbing fixtures on order and had to purchase substitute fixtures on the open market, at an additional cost to him of $1,278.91.[8]
17. Electric wiring for hot air heating system. — The heating system of each building under both contracts 127 and 150 required special wiring for the hot air circulating controls. At the urging of the defendant’s representatives who wanted to advance the occupancy of the buildings, Harney, who had already arranged to have the wiring work performed, negotiated with two larger contractors who were able to complete the work more rapidly at a higher cost.
In the meantime Sullivan hired an electrical contractor to do the work on a cost-plus basis. The wiring was installed in accordance with a new diagram prepared by defendant’s supervisory engineer without approval by higher authority, and necessitated the changing of heat controls by Harney to accommodate the new plan of wiring.
*81 After the wiring was installed it was found unsatisfactory and the construction quartermaster directed that the work be revised in accordance with a plan previously prepared by Harney and approved. This necessitated the reinstallation by Harney of heat controls as originally provided.
Sullivan paid $4,188.84 for this work and deducted the same from sums otherwise due Harney. The increased cost to Harney by reason of these changes was $3,033.84 ($2,167.04 under contract 127 and $866.80 under contract 150) ,[9]
18. Temporary smoke pipes for W barraeJcs. — As a result of defendant’s urging to advance the occupancy date of the barracks, and at the authorization of defendant’s heating inspector, Harney installed between the heaters and chimneys in 20 barracks temporary smoke pipes which did not comply with specifications. The smoke pipes, which were temporary expedients through the winter period, were later replaced with specification pipes at an additional cost to Harney of $706.95.
19. Transportation of plvmbers and steamfitters. — In order to meet similar allowances made under a Government cost-plus-fixed-fee contract let later to other contractors at Fort Devens, Harney was compelled by the unions to pay his union employees 50 cents a day for transportation to and from the job site. Of the total amount of such transportation allowances paid by Harney throughout the contract period, $137.50 relates to the performance of extra work and represents additional cost to him not otherwise reimbursed or included in other items of claim herein reported.
20. Extra trucking. — Harney claims $317 additional expense for 212 hours of extra trucking occasioned by reason of the advancement of completion of the barracks and overtime required for such performance. While extra trucking was performed, fair allowances for the cost thereof have been included in Findings 13,15 and 16, supra.
21. Installation of piping and traps four feet below grades inside of buildings. — Harney claims the additional cost of installing piping and water traps four feet below grade in *82 side of the buildings, which was performed under verbal protest. Contract drawings show the piping layout, but do not show the depth of the pipes below grade. Nor did Har-ney’s plan for the piping layout, which was approved by the construction quartermaster, show the depth of the piping. The specifications provide:
Plumbing
P-1. Scope of work: * * * Where drainage pipes are shown 1%" and are buried in the ground, they are to be increased to 2". All waste pipes and dram pipes below the floor levels of all buildings shall be buried in the ground at least 4'0" below ground grade.
* * $ * ❖
P-8. General directions: * * * Unless otherwise directed all underground piping outside of buildings shall be installed below the frost line. The exterior utilities shown on plans are diagrammatic and their exact location, depth and invert elevations shall be as directed by the C. Q. M. without additional cost to the U. S.
* * * Where waste pipes are buried in the ground, they are not to be smaller than 2".
t- * * # *
P-16. Traps: Each fixture and piece of equipment requiring connections to drainage system (except fixtures trapped through grease interceptors) shall be separately trapped. The traps shall be placed as near to the fixture as possible and no fixture shall be double trapped. * * *
The specifications also provided under “Excavating, filling and grading”:
4. Excavation: * * * All footings shall be excavated to a depth not less than 6" below natural grade and 6" below normal frost line of 3'6".
5. Backfilling and grading: * * * Grading under buildings and within an area ten feet outside of building lines shall be performed in such manner as to prevent accumulation of water within the area. * * *
The final grades under the buildings were not established until after contract 127 was awarded.
The toilet and wash rooms and the heater room in each barracks, where the underground drainage and waste piping *83 were required, were provided with concrete slab flooring poured upon the compacted earth base. Harney ran the drain pipes from approximately four feet underground outside of the buildings with a vertical rise inside of the building walls for installation immediately below the concrete floor slabs.
Defendant’s supervisory engineer stopped the installation of piping in this manner and required that all piping and traps be installed to a uniform depth of four feet below the ground level to avoid freezing. Harney protested this requirement verbally. There was no danger of freezing underneath the concrete floor slabs of these rooms, which were heated, and traps for the wash bowls and wash trays were installed above the concrete floor level.
Harney requested a written order requiring these installations four feet below the ground level as extra work which the supervisory engineer declined to furnish. All piping and drainage traps were installed four feet below the ground level as required by defendant’s supervisory engineer.
When the work was substantially completed, a representative of the construction quartermaster found it objectionable to have these installations four feet below the ground level, because of difficulty and expense of cleaning the pipe traps.
The contract specifications and drawings did not require Harney to make such installations four feet below ground level. The additional cost to Harney resulting from the extra work performed under erroneous instructions of the supervisory engineer was $1,583.70 ($1,055.80 under contract 127 and $527.90 under contract 150).
22. Changes in duet world for heating systems. — The barracks plans required the installation of metal circulating ducts from the heating room in each barracks to the first and second floors. Harney prefabricated the duct work for installation in each barracks, but in the course of installation found an obstruction on the second floor ceiling in the form of a structural roof brace which was not indicated on the plans or specifications which had been furnished him to follow. Defendant’s inspector would not permit the relocation of the impeding roof brace so as to allow the installation *84 of Harney’s prefabricated ducts to proceed as planned, and Sullivan ordered Harney to alter the duct work so as to accommodate the uncontemplated situation, assuring him that a change order would be issued. Harney altered the duct work accordingly and installed the same, and Sullivan backcharged against Harney certain charges for carpentry work necessitated by the change. No change order was issued. The additional cost to Harney for the changes made was $2,667.69 ($1,778.46 under contract 127 and $889.23 under contract 150).
23. Covering smoke breeching in mess hall. — The plans and specifications did not require insulation of the smoke breeching from the mess hall boilers to the chimneys. Under instructions from defendant’s supervisory engineer, Sullivan installed insulation covering on the smoke breeching, backcharging the cost against Harney, and Harney installed certain additional covering on exposed portions of the smoke breeching connections. The additional cost to Harney for the extra work, including Sullivan’s backcharge, was $582.59.
24. Lowering floor drams in heater rooms. — After Harney had installed all plumbing and heating facilities in the barracks under the plans for their advanced occupancy, the defendant established the final floor grades for the heater rooms, thereby causing expenses in the amount of $166.99 to Harney in lowering floor drains to accommodate the final grades.
25. Plumbing and heating maintenance work during occupancy of barracks. — The 20 barracks under contract 127 were completed for occupancy in November 1940, but were not officially accepted as completed until May 9, 1941. During the period of occupancy prior to formal acceptance, the plumbing and heating facilities were used and operated by military personnel. Eeports of frozen pipes, stopped toilets and traps, and damaged or missing equipment were referred to Harney for correction, and required the equivalent of the full-time services of a plumber and helper for approximately a 60-day period. While an indeterminable amount of the work done was corrective in nature and Harney’s responsibility, the reasonable cost to Harney for providing repairs *85 and replacements that were not his responsibility was $2,000.[10]
26. Increased wages for carpenters. — Sullivan employed carpenters to install asbestos board over furnaces in the buildings and backcharged the cost to Harney. Although the contracts specify a rate of $1,125 per hour for carpenters in the contract area, Sullivan was obliged to pay them $1.25 per hour to meet similar rates paid to carpenters working on a government cost-plus-fixed-fee contract let later to contractors at Fort Devens. The total wage differential thus paid was $15, which was not included in the prior labor claim by Harney which was settled (see Finding 85, supra).
27. Destruction of portable field office and work shop.— Upon the completion of his work, Harney dismantled his field office and work shop for removal from the site, but was unable to obtain a permit for its removal the same day. Upon return to Fort Devens for a permit he discovered that the siding and timbers had been broken up and used by soldiers for camp fires and other purposes, without authority of government contract representatives.
The value of the materials so used or destroyed was $290.
28. Liquidated damages. — In the final settlement between defendant and Sullivan liquidated damages of $882.50 were assessed and deducted from the contract prices for delay in completion. The amounts reserved in releases executed by Sullivan June 30, 1941, did not include recovery of the liquidated damages. Sullivan deducted $441.25 from his settlement with Harney as the latter’s one-half share of the liquidated damages, of which sum $341.25 was allocable to contract 127 and $100 to contract 150. The barracks were occupied prior to contract completion dates. The only items of plumbing and heating which substantially delayed completion and acceptance were replacement of temporary smoke pipes which were installed on the furnaces in the barracks to provide heat for earlier occupancy, and the replacement of motors for the heat circulating fans which did not meet specifications because they lacked covers. Permission was granted to replace these items after the heating season to *86 prevent interruption of the heating. The motors were replaced in early May 1940. Lack of these items did not delay useful occupancy of the buildings. Although the earlier occupancy of the buildings impeded the progress of Harney’s work and caused him delay, defendant granted Harney no time extensions on that account.
29. Increased labor claim. — On September 15,1941, Sullivan prepared and submitted to the War Department 11 labor claims totaling $18,996.51, which included $4,464.77[11] for certain excess labor costs, involving plumbing and heating work done by Harney. After submission by the War Department to the General Accounting Office, and recommendation by the latter to Congress, Private Law No. 552, 77th Congress, was enacted and approved December 7,1942. The Private Law authorized the Comptroller General to allow Sullivan “in full and final settlement of the claim the sum of not to exceed $14,481.87.” Prior to receiving from the Comptroller General $14,481.87 pursuant to a settlement certificate, Sullivan acknowledged in writing that it would be accepted “in full and final settlement” of the labor claim. After receiving the $14,481.87 Sullivan paid Harney $4,314.16,[12] the amount deemed applicable to that part of the original labor claim relating to Harney’s subcontracts and Harney accepted the same.
During performance of the contracts, the Government entered into a cost-plus-fixed-fee contract with two other contractors for certain construction at Fort Devens in proximity to the work under contracts 127 and 150. The War Department authorized for the cost-plus-fixed-fee contract a higher wage rate than the prevailing wage rate in that area as de-terminated by the Secretary of Labor, and higher than the minimum rates specified in contracts 127 and 150. In order to prevent their employees from quitting and accepting employment at higher rates under the nearby cost-plus-fixed-fee contract, Sullivan and Harney were compelled to meet the higher wage rates, and also to pay their employees higher *87 overtime rates on Saturdays, Sundays and holidays to correspond to their competitor. Had Sullivan and Harney not increased their wage rates to compete in the labor market, the completion of contracts 127 and 150 would have been delayed and the national defense program would have been adversely affected. The conditions arose by reason of governmental action and were not foreseeable by Sullivan or Harney.
Senate Bill No. 982 and H. R. 1598 of the 81st Congress, which were referred to this court by Senate Resolutions 152 and 165 (see Finding 2a, supra), provided in part—
All of the above claims are exclusive and beyond the sums of money paid by the War Department to D. A. Sullivan and Sons, Incorporated, in full and final settlement of the claims for increased labor costs for which allowance has already been made and paid to the said corporation.
In his share of the labor claim settlement, Harney received $2,006.08 less than his share of the amount originally claimed. Of this amount $78.32 was expended on certain items of extra work in the instant claim “exclusive and beyond the sums of money paid by the War Department to D. A. Sullivan and Sons, Incorporated, in full and final settlement of the claims for increased labor costs for which allowance has already been made and paid to the said corporation.” The $78.32 has been included in the amounts heretofore found in the preceding findings as follows:
Finding 13_$62.91
Finding 14_ 2.57
Finding 24_ 12. 84

 Sec. 1492 reads as follows: “The Court of Claims shall have jurisdiction to report to either House of Congress on any bill referred to the court by such House, except a bill for a pension, and to render judgment if the claim against the United States represented by the referred bill is one over which the court has jurisdiction under other Acts of Congress.”
,Sec. 2509 reads as follows: “Whenever any bill, except for a pension, is referred to the Court of Claims by either House of Congress, such court shall proceed with the same in accordance with its rules and report to such House, the facts in the case, including facts relating to delay or laches, facts bearing upon the question whether the bar of any statute of limitation should be removed, or facts claimed to excuse the claimant for not having resorted to any established legal remedy.
The court shall also report conclusions sufficient to inform Congress whether the demand is a legal or equitable claim or a gratuity, and the amount, if any, legally or equitably due from the United States to the claimant.”

 But see the Act of May 11, 1954, Public Law 356, Section 2 which provides that “No Government contract shall contain a provision making final on a question of law the decision of any administrative official, representative, or board.”

 No allowance for overhead or profit was allowed for that work set out In finding 17.

 House Report No. 676, 81st Congress, reporting H. R. 1598.

 Including Harney’s own time, extra payments to working foremen, timekeeper’s pay, and certain indeterminable job costs.

 I. e., direct costs plus supervision and overhead.

 This sum Is exclusive of transportation allowances of $91 paid to employees, which Is dealt with In Finding 19, infra.

 Includes $400 for labor not supported by documentary evidence, but found to be fair and reasonable on the evidence presented.

 No allowance for overhead or profit was made on this item since the work involved other than the reinstallation of the heat controls was done by another subcontractor.

 “Includes $1,392 for labor not supported by documentary evidence, but found to be fair and reasonable on the evidence presented.

 Harney actually claimed $6,320.24, but apparently Sullivan, who prepared tbe claim, reduced Harney’s share of the labor claim to $4,464.77 in submitting it to the War Department.

 “ In auditing Harney’s share of me labor claim the General Accounting Office used Harney’s own details totaling $6,320.16 in arriving at the allowable amount of $4,314.16.